## UNITED STATES *v.* MONIA ET AL.

No. 248. Argued December 16, 1942.—Decided January 11, 1943.

Mr. *Edward H. Miller*, with whom *Solicitor General Fahy, Assistant Attorney General Arnold*, and *Mr. Robert L. Stern* were on the brief, for the United States.

*Mr. A. L. Hodson,* with whom *Messrs. Charles J. Faulkner, Jr., Weymouth Kirkland, John P. Barnes, R. F. Feagans, Walter. H. Jacobs,* and *Thomas A. Reynolds* were on the brief, for appellees.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

This is a direct appeal from the District Court for Northern Illinois prosecuted pursuant to the Criminal Appeals Act.[1] It presents a question upon which the lower federal courts have sharply divided.[2] The question is whether one who, in obedience to a subpoena, appears before a grand jury inquiring into an alleged violation of the Sherman Act, and gives testimony under oath substantially touching the alleged offense, obtains immunity from prosecution for that offense, pursuant to the terms of the Sherman Act, although he does not claim his privilege against self-incrimination.

The Sherman Act [3] provides in part:

". . . no person shall be prosecuted or be subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he may testify or produce evidence, documentary or otherwise, in any proceeding, suit, or prosecution under said Acts [the Interstate Commerce Act, the Sherman Antitrust Act, and other acts]; *Provided further,* that no person so testifying

---

[1] Act of March 2, 1907, 34 Stat. 1246, as amended by the Act of May 9, 1942, 56 Stat. 271, 18 U. S. C. 682.

[2] Compare *United States* v. *Armour & Co.,* 142 F. 808; *United States* v. *Skinner,* 218 F. 870; *United States* v. *Elton,* 222 F. 428; *United States* v. *Lee,* 290 F. 517; *Johnson* v. *United States,* 5 F. 2d 471; *United States* v. *Lay Fish Co.,* 13 F. 2d 136; *United States* v. *Greater New York Live Poultry C. of C.,* 33 F. 2d 1005, with *United States* v. *Pardue,* 294 F. 543; *United States* v. *Ward,* 295 F. 576; *United States* v. *Moore,* 15 F. 2d 593; *United States* v. *Goldman,* 28 F. 2d 424.

[3] Act of February 25, 1903, c. 755, 32 Stat. 854, 904, 15 U. S. C. 32.

shall be exempt from prosecution or punishment for perjury committed in so testifying."

That statute was supplemented by the Act of June 30, 1906,[4] which, so far as material, is

". . . under the immunity provisions [of the above Act and others] immunity shall extend only to a natural person who, in obedience to a subpoena, gives testimony under oath or produces evidence, documentary or otherwise, under oath."

An indictment was returned charging corporations and individuals, including the two appellees, with conspiracy to fix prices in violation of the Sherman Act. The appellees filed special pleas in bar, each alleging that, in obedience to a subpoena duly served, he appeared as a witness for the United States before the grand jury inquiring respecting the matters charged in the indictment, and gave testimony substantially connected with the transactions covered by the indictment. No question is made but that the testimony so given did substantially relate to the transactions which were the subject of the indictment.

The United States demurred to the pleas as insufficient, since neither alleged that the witness asserted any claim of privilege against self-incrimination and therefore neither the Fifth Amendment of the Constitution nor the immunity statute could avail him.

The District Court overruled the demurrers on the ground that the plain mandate of the statute precluded prosecution of the appellees whether they had claimed the privilege or not. We hold that the decision was right.

Beyond dispute the appellees were entitled to immunity from prosecution if the statute is to be given effect as it is written. We are asked, however, to read into it a qualification to the effect that immunity is not obtained unless the privilege against self-incrimination is claimed. Inas-

[4] 34 Stat. 798, 15 U. S. C. 33.

much as the statute is addressed to this privilege, and the privilege is accorded by the Fifth Amendment, it is said that if immunity is offered as a substitute for the privilege, the immunity, like the privilege, ought to be claimed; that thus the statute and the Fifth Amendment, which are *pari materia,* will be given a consistent construction.

In the second place, it is urged that qualification of the forthright terms of the statute is necessary in order to avoid an unreasonable, unfair, and unintended result. The argument runs that if the statute is construed automatically to grant immunity without a claim of privilege, the prosecutor is at a disadvantage, since he does not know whether, or to what extent, a witness may have participated in a crime; and so runs the risk of unintentionally affording immunity. On the other hand, so it is said, the witness has full knowledge as to the nature of his own conduct, and as to his possible incrimination by testimony, and it is not unfair to require him to claim his privilege and so put the prosecutor on notice that, if he insists upon the testimony, the witness will obtain immunity.

The well-understood course of legislation before and after the adoption of the statute involved, and the legislative history, compel rejection of the contentions.

The Fifth Amendment declares that "No person . . . shall be compelled in any criminal case to be a witness against himself." An investigation by a grand jury is a criminal case.[5] The Amendment speaks of compulsion. It does not preclude a witness from testifying voluntarily in matters which may incriminate him. If, therefore, he desires the protection of the privilege, he must claim it or he will not be considered to have been "compelled" within the meaning of the Amendment.[6]

More than seventy years ago Congress was advised that, in suits prosecuted by the United States, where

---

[5] *Counselman* v. *Hitchcock,* 142 U. S. 547, 562.

[6] *United States ex rel. Vajtauer* v. *Commissioner,* 273 U. S. 103, 113.

evidence had been sought from certain persons, to be used by the Government, they had interposed a claim of privilege which had been sustained by the courts.[7] In order to forestall the obstruction and delay incident to judicial determination of the validity of the witness' claim, and in order to obtain necessary evidence, even though the claim were well founded, Congress adopted the Act of February 25, 1868,[8] which became R. S. 860. This Act applied to all judicial proceedings and provided, in effect, that no evidence obtained from a witness could be used against him in a criminal proceeding.

This court, in *Counselman* v. *Hitchcock,* 142 U. S. 547, held the Act unconstitutional because, while it prevented the use of the evidence against the witness, it did not preclude his prosecution as a result of information gained from his testimony. The court indicated clearly that nothing short of absolute immunity would justify compelling the witness to testify if he claimed his privilege.

The original Interstate Commerce Act[9] contained an immunity provision in the form held invalid in the *Counselman* case. To meet the decision in that case, Congress passed the Act of February 11, 1893,[10] which applied only to proceedings under the Interstate Commerce Act. This statute, however, became the model for immunity provisions which were enacted at various times up to 1933, including the Act of February 25, 1903, *supra,* with which we are here concerned. This court sustained the constitutionality of these Acts.[11]

In 1906 the District Court for the Northern District of Illinois held, in *United States* v. *Armour & Co.,* 142 F. 808, that a voluntary appearance, and the furnishing of

---

[7] Cong. Globe, 40th Cong., 2d Sess., pp. 950–51, 1334.

[8] 15 Stat. 37.

[9] 24 Stat. 383.

[10] 27 Stat. 443, 49 U. S. C. 46.

[11] *Brown* v. *Walker,* 161 U. S. 591.

testimony and information without subpoena, operated to confer immunity from prosecution under the Sherman Act. The court held that the immunity conferred was broader than the privilege given by the Fifth Amendment. The decision attracted public interest since, if it stood, one could immunize himself from prosecution by volunteering information to investigatory bodies. Congress promptly adopted the Act of June 30, 1906, *supra*, providing that the immunity should only extend to a natural person who, in obedience to a subpoena, testified or produced evidence under oath. The Congressional Record shows that the sole purpose of the bill was exactly what its language states.[12] Senator Knox, who sponsored the bill, stated: "Mr. President, the purpose of this bill is clear, and its range is not very broad. It is not intended to cover all disputed provisions as to the rights of witnesses under any circumstances, except those enumerated in the bill itself."

It is evident that Congress, by the earlier legislation, had opened the door to a practice whereby the Government might be trapped into conferring unintended immunity by witnesses volunteering to testify. The amendment was thought, as the Congressional Record demonstrates, to be sufficient to protect the Government's interests by preventing immunity unless the prosecuting officer, or other Government official concerned, should compel the witness' attendance by subpoena and have him sworn.

Not until 1933 did Congress evidence an intent that if the witness desired immunity he must, in addition, assert his constitutional privilege. In a series of acts adopted between 1934 and 1940 an additional provision was inserted adding this requirement.[13] These acts indicate

---

[12] 40 Cong. Rec. 5500, 7657–58, 8734–39–40.

[13] See e. g. Securities Exchange Act, 48 Stat. 900, 15 U. S. C. 78u (d); Investment Advisers Act, 54 Stat. 853, 15 U. S. C. 80b–9 (d).

how simple it would have been to add a similar provision applicable to the Interstate Commerce Act, the Sherman Act, and others which have been allowed to stand as originally enacted save for the amending Act of 1906.[14]

The legislation involved in the instant case is plain in its terms and, on its face, means to the layman that if he is subpoenaed, and sworn, and testifies, he is to have immunity. Instead of being a trap for the Government, as was the original Act, the statutes in question, if interpreted as the Government now desires, may well be a trap for the witness. Congress evidently intended to afford Government officials the choice of subpoenaing a witness and putting him under oath, with the knowledge that he would have complete immunity from prosecution respecting any matter substantially connected with the transactions in respect of which he testified, or retaining the right to prosecute by foregoing the opportunity to examine him. That Congress did not intend, or by the statutes in issue provide, that, in addition, the witness must claim his privilege, seems clear. It is not for us to add to the legislation what Congress pretermitted.

We have referred to the diversity of views amongst the lower courts. The Government insists that this court has settled the question in favor of its view. Its reliance is upon *Heike* v. *United States*, 227 U. S. 131. That case, however, decided only that the immunity conferred by the legislation in question was intended to protect the witness to the same extent that the Fifth Amendment protects him. The question was whether the immunity extended to prosecution for crimes with which the matters testified to were but remotely connected. This court held that, as the Amendment did not justify a claim of

---

[14] It may be, that, due to the thoroughness of preliminary investigation in the classes of cases in question, Congress has believed that the Government's representatives needed no further warning of the result of subpoenaing a witness and examining him under oath.

privilege against such remote contingencies, the immunity should be likewise construed not to reach them. The question of the necessity of a witness before an investigatory body claiming his privilege in order to earn his immunity was not decided.

The judgment is

*Affirmed.*

MR. JUSTICE FRANKFURTER, dissenting:

It is beyond dispute that the Constitution does not compel Congress to afford immunity from prosecution to those who testify without invoking the constitutional privilege against self-incrimination. The question for decision here is whether, by the Act of June 30, 1906, 34 Stat. 798, amending the immunity provision of the Act of February 25, 1903, 32 Stat. 904, Congress granted more than the Constitution requires and offered a "gratuity to crime," *Heike* v. *United States,* 227 U. S. 131, 142, by conferring immunity to persons who testify without claiming the protection of the privilege against self-incrimination and who in no way indicate that their testimony is being given in return for the statutory immunity. In other words, did Congress, by that amendment, seek to facilitate the enforcement of law by making "evidence available and compulsory that otherwise could not be got," *ibid.,* or was it passing an act of amnesty?

This question cannot be answered by closing our eyes to everything except the naked words of the Act of June 30, 1906. The notion that because the words of a statute are plain, its meaning is also plain, is merely pernicious oversimplification. It is a wooden English doctrine of rather recent vintage (see Plucknett, A Concise History of the Common Law, 2d ed., 294–300; Amos, The Interpretation of Statutes, 5 Camb. L. J. 163; Davies, The Interpretation of Statutes, 35 Col. L. Rev. 519), to which lip service has on occasion been given here, but which since

the days of Marshall this Court has rejected, especially in practice. *E. g., United States* v. *Fisher,* 2 Cranch 358, 385–86; *Boston Sand Co.* v. *United States,* 278 U. S. 41, 48; *United States* v. *American Trucking Assns.,* 310 U. S. 534, 542–44. A statute, like other living organisms, derives significance and sustenance from its environment, from which it cannot be severed without being mutilated. Especially is this true where the statute, like the one before us, is part of a legislative process having a history and a purpose. The meaning of such a statute cannot be gained by confining inquiry within its four corners. Only the historic process of which such legislation is an incomplete fragment—that to which it gave rise as well as that which gave rise to it—can yield its true meaning. And so we must turn to the history of federal immunity provisions.

The earliest federal statute dealing with immunity is the Act of January 24, 1857, 11 Stat. 155, as amended by the Act of January 24, 1862, 12 Stat. 333. This legislation, relating to testimony before either House of Congress, furnished a model for later immunity provisions. Congress was careful to state precisely what it was for which immunity was given: "No witness shall hereafter be allowed *to refuse to testify* to any fact or to produce any paper. . . ." 11 Stat. 156 (italics added). It was the refusal to testify, not the refusal to appear as a witness, which Congress took away and for which it gave immunity.

Duty, not privilege, lies at the core of this problem—the duty to testify, and not the privilege that relieves of such duty. In the classic phrase of Lord Chancellor Hardwicke, "the public has a right to every man's evidence." [1] The duty to give testimony was qualified at

---

[1] Debate in the House of Lords on the Bill to indemnify Evidence, 12 Hansard's Parliamentary History of England, 675, 693, May 25, 1742, quoted in 8 Wigmore on Evidence (3d ed.) p. 64, § 2192.

common law by the privilege against self-incrimination. And the Fifth Amendment has embodied this privilege in our fundamental law. But the privilege is a privilege to withhold answers and not a privilege to limit the range of public inquiry. The Constitution does not forbid the asking of criminative questions. It provides only that a witness cannot be compelled to answer such questions unless "a full substitute" for the constitutional privilege is given. *Counselman* v. *Hitchcock,* 142 U. S. 547, 586. The compulsion which the privilege entitles a witness to resist is the compulsion to answer questions which he justifiably claims would tend to incriminate him. But the Constitution does not protect a refusal to obey a process. A subpoena is, of course, such a process, merely a summons to appear. 8 Wigmore on Evidence (3d ed.) p. 106, § 2199. There never has been a privilege to disregard the duty to which a subpoena calls. And when Congress turned to the device of immunity legislation, therefore, it did not provide a "substitute" for the performance of the universal duty to appear as a witness— it did not undertake to give something for nothing. It was the refusal to give incriminating testimony for which Congress bargained, and not the refusal to give any testimony. And it was only in exchange for self-incriminating testimony which "otherwise could not be got" (*Heike* v. *United States,* 227 U. S. 131, 142) because of the witness's invocation of his constitutional rights that Congress conferred immunity against the use of such testimony.

Instead of giving more than the constitutional equivalent for the privilege against self-incrimination, Congress for a long time did not give enough. See *Counselman* v. *Hitchcock,* 142 U. S. 547, invalidating the Act of February 25, 1868, 15 Stat. 37, R. S. § 860, the first immunity statute relating to judicial proceedings. In order to remove the gap between what this Act gave and what the Constitution was construed to require, Congress promptly

passed the Act of February 11, 1893, 27 Stat. 443, in order not to interrupt the effective enforcement of the Interstate Commerce Act. As the debates reveal, Congress acted on its understanding of what this Court in the *Counselman* decision indicated was an adequate legislative alternative. See remarks of Senator Cullom, July 18, 1892, 23 Cong. Rec. 6333. The 1893 Act followed the language of the Act of January 24, 1857, by providing that "no person shall be *excused from attending and testifying* or from producing books . . ." 27 Stat. 443 (italics added). And in 1896 this Court, in *Brown* v. *Walker*, 161 U. S. 591, 595, found that the 1893 Act "sufficiently satisfies the constitutional guarantee of protection." There was no indication of any belief that Congress had given anything more than it had to give—and, indeed, only a bare majority of the Court thought that the statute had given as much as the Constitution required.

Certainly until the beginning of this century, therefore, Congress displayed no magnanimity to criminals by affording amnesty for their crimes. Indeed, so sensitive has Congress been against immunizing crime that it has not entrusted prosecutors generally with the power to relieve witnesses from prosecution in exchange for incriminating evidence against others. But as part of the legislative program for the correction of corporate abuses, Congress in February 1903 included provisions for immunity in three additional measures, the Act of February 14, 1903, 32 Stat. 828, establishing the Department of Commerce and Labor and conferring upon the Commissioner of Corporations the investigatory powers possessed by the Interstate Commerce Commission, the Elkins Amendment of February 19, 1903, 32 Stat. 848, to the Interstate Commerce Act, and the Act of February 25, 1903, 32 Stat. 903–04, making large appropriations for the enforcement of the Interstate Commerce Act, the Sherman Law, and other enactments. It is this latter

provision, as amended by the Act of 1906, which is immediately before us.

It was not until the startling decision of District Judge Humphrey in *United States* v. *Armour & Co.*, 142 F. 808, that the suggestion was seriously made that Congress, in studiously fashioning a constitutional equivalent for the privilege against self-incrimination, was playing Lady Bountiful to criminals. The particular concerns which the *Armour* opinion stirred must be heeded because they provoked the Act of 1906. The meaning of that legislation is lost unless derived from the circumstances which gave rise to it. The case arose out of a proceeding begun under the Act of February 14, 1903, 32 Stat. 825, creating the Department of Commerce and Labor. Section 8 of that Act provided that the Secretary of Commerce and Labor shall "from time to time make such special investigations and reports as he may be required to do by . . . either House of Congress." In obedience to a resolution of the House of Representatives, the Secretary directed the Commissioner of Corporations to investigate the causes of the low prices of beef cattle. Accordingly, the Commissioner instituted such an inquiry. At a conference with officers of the packing corporations and their counsel, the Commissioner explained the purposes and scope of his investigation. He informed them that he was acting independently and not in coöperation with the Department of Justice in its contemporaneous proceeding against the "Beef Trust" for alleged violations of the Sherman Law, and that any evidence obtained from the packers would not be given to the Department but would be reported only to the President for his appropriate use. (H. Doc. No. 706, 59th Cong., 1st Sess., p. 6.) Thereupon the Commissioner's agents were afforded an opportunity to examine the packers' books and papers.

Subsequently, an indictment under the Sherman Law was found against the packing corporations and their

officers. Pleas in bar were filed, alleging in substance that, as a result of the investigation made by the Commissioner of Corporations, the defendants had obtained immunity from prosecution for the offenses charged in the indictment. Judge Humphrey sustained these pleas as to the individual defendants on the ground that the information furnished by the defendants brought into operation the immunity provision of the Act of February 14, 1903, which incorporated by reference the Act of February 11, 1893, 27 Stat. 443, relating to testimony before the Interstate Commerce Commission. Judge Humphrey reached his conclusion by attributing to Congress in passing the Act of February 11, 1893, a purpose which this Court later unanimously rejected in *Heike* v. *United States,* 227 U. S. 131. For while Judge Humphrey correctly held that "the privilege of the amendment permits a refusal to answer," he also stated, quite incorrectly and without any warrant in the language, legislative history or policy of the Act, that the statute "wipes out the offense about which the witness might have refused to answer." 142 F. at 822. In other words, the district judge treated the immunity act as though it were an act of amnesty, and that is precisely what this Court in the *Heike* case said it was not: "Of course there is a clear distinction between an amnesty and the constitutional protection of a party from being compelled in a criminal case to be a witness against himself. Amendment V. But the obvious purpose of the statute [the Act of February 25, 1903] is to make evidence available and compulsory that otherwise could not be got. We see no reason for supposing that the act offered a gratuity to crime. It should be construed, so far as its words fairly allow the construction, as coterminous with what otherwise would have been the privilege of the person concerned. We believe its policy to be the same as that of the earlier act of February 11, 1893, c. 83, 27 Stat. 443,

which read 'No person shall be excused from attending and testifying,' &c. 'But no person shall be prosecuted,' &c., as now, thus showing the correlation between constitutional right and immunity by the form." 227 U. S. at 142.

Judge Humphrey doubtless fell into error because he treated the immunity provision as subsidiary to the main purpose, as he conceived it, of the Act establishing the Department of Commerce and Labor. He believed "the primary purpose" of that Act was to "secure information for the use of the legislative body." 142 F. at 826. It is plain that he did not view the immunity provisions in their true light, that is, as means to facilitate the administration of the criminal law. Whatever justification Judge Humphrey may have had for entertaining such a notion with regard to the Act creating the Department of Commerce and Labor, it certainly has no application to the immunity provisions touching the Interstate Commerce Act and the Sherman Law. Those provisions were enacted as aids in the enforcement of criminal justice; they were not acts of amnesty designed to wipe out criminal offenses.

Acting swiftly to correct the error of the *Armour* decision, the President recommended that "the Congress pass a declaratory act" to set aside Judge Humphrey's misconception of congressional purpose. Message from the President of the United States, April 18, 1906, H. Doc. No. 706, 59th Cong., 1st Sess., p. 3. In so doing, President Theodore Roosevelt was acting upon the advice of Attorney General (soon to become Mr. Justice) Moody. Naturally enough, the declaratory legislation directed itself to the correction of the two evils that Judge Humphrey's opinion projected, namely, to make it clear that immunity should not be afforded for producing corporate documents which could in any event be had because the privilege against self-crimination is not available to cor-

porations, *Wilson* v. *United States*, 221 U. S. 361, 372–74, and that a person who does not give evidence under the ordinary formalities incident to being a witness was not entitled to immunity. The legislation was responsive to the Government's position, as stated by Attorney General Moody: "Upon these facts [in the *Armour* case] the Government contended that the statutory immunity could be conferred only upon persons subpoenaed by the Commissioner of Corporations who might subsequently give testimony or evidence (in the legal sense of those terms) relating to the subject-matter of the indictment." H. Doc. No. 706, 59th Cong., 1st Sess., p. 7.

Such was the limited purpose of the 1906 amendment. Could it be that the President having proposed, and the Congress having enacted, a restrictive declaration regarding the scope of the immunity provision in order to prevent other courts from following the latitudinarian misconception of Judge Humphrey, the President and the Congress, both acting upon the advice of one of the ablest of Attorneys General, were unwittingly betrayed into introducing a new gratuity for witnesses under duty to respond to a subpoena, by giving an amnesty in exchange for the mere response?

For more than seventeen years thereafter it was unquestioned that Congress had given no more than the Constitution required—freedom from prosecution for evidence that could not otherwise be obtained, evidence that was withheld upon claim of constitutional privilege, evidence that was given only because Congress had provided immunity. This was the ruling of all the federal courts which considered the question, courts on which sat some of the ablest judges of their day—Judge Martin in *United States* v. *Heike,* 175 F. 852; Judge Grubb in *United States* v. *Skinner,* 218 F. 870; Judge Hunt in *United States* v. *Elton,* 222 F. 428; and Judge Rose in *Johnson* v. *United States,* 5 F. 2d 471. The narrow purpose of the 1906

amendment, in the light of the events which gave rise to it, was succinctly set forth by Judge Rose: "Quite clearly this act did only two things and it was intended to do no more. It made it clear that the immunity granted did not inure to the benefit of corporations and that a natural person could not claim it unless he had testified in obedience to a subpoena. It was passed to meet the serious situation which the President and Congress thought had been created by the rulings of Judge Humphrey. . . . It was clearly not intended to change the previously existing law in any other respect. . . . A construction should not be given to it which would result in a grand jury or prosecuting officer unwittingly conferring immunity upon a serious offender because in the best of good faith, and with no reason to suppose that he was criminally involved in the transaction, he was subpoenaed to produce some documents or to give some testimony which perhaps could just as well have been obtained from other sources. Unquestionably the witness has the constitutional right to object to testifying. Then it is open to the government to elect whether it will or will not proceed with his examination under the statute, but if it does not, his rights remain as they were before he was called to the stand." *Johnson* v. *United States,* 5 F. 2d 471, 477.

The observations of Judge Grubb in *United States* v. *Skinner,* 218 F. 870, 879, are equally pertinent here: "The witness, in many cases, is alone informed as to whether his evidence will tend to incriminate him. The supposed incrimination may relate to offenses not under investigation by the examining tribunal, and of the existence of which or of the relation of the desired evidence to which the examining tribunal or the government law officer may have no knowledge. The Heike Case is an apt illustration of this possibility. The witness is likely to have exclusive knowledge as to what facts and what answers may tend to his incrimination, and with reference to what

offenses.  Again, the witness alone knows whether he
willingly gives his evidence for the purpose of exonerating
himself, or only with the expectation of receiving immu-
nity therefor.  He is therefore in a better position to be
called upon to assert his constitutional privilege than
is the examining tribunal or the law officer of the govern-
ment to call upon him to elect to do so.  If any hardship
attends the imposition of this burden on the witness, it
has never been considered weighty enough to relieve
him therefrom in exercising his constitutional privilege,
prior to the immunity statutes.  The immunity granted
by the statute is a mere substitute for the constitutional
safeguard, and has been held by the Supreme Court to
be coterminous with it.  There would seem, therefore,
to be no reason for a different practice as to the assertion
of the privilege where immunity is desired and where
the constitutional privilege is insisted upon."

These decisions thus reflected weighty considerations
of policy in finding that Congress afforded immunity from
prosecution only to the extent that the Constitution re-
quired in exchange for a privilege and that Congress
was not giving away indulgences.

These considerations of policy were certainly not
answered in the opinion of the Texas district court which,
in 1923, made the first departure from this uniform con-
struction of the statute.  The court held that immunity
came merely because one testified in obedience to a
subpoena, without any claim, either explicit or implied
by the circumstances, that he had a constitutional right
to refuse to answer on the ground that he might thereby
be incriminated and that the testimony was being given
only under compulsion of the immunity statute.  *United
States* v. *Pardue,* 294 F. 543.  The court stated that its
position was supported by the weight of authority, citing
(1) the decision of Judge Humphrey in the *Armour* case;
(2) *United States* v. *Swift,* 186 F. 1002, the opinion in

which, so far as it is relevant to the question here, seems to point clearly the other way (see, especially, 186 F. at 1016–18); (3) *State* v. *Murphy,* 128 Wis. 201, 107 N. W. 470, which, much questioned originally, has been repudiated by the court which rendered it, *Carchidi* v. *State,* 187 Wis. 438, 204 N. W. 473, and *State* v. *Grosnickle,* 189 Wis. 17, 206 N. W. 895; and (4) a decision of the New York Court of Appeals, *People* v. *Sharp,* 107 N. Y. 427, 14 N. E. 319. In considering "the reasons which should control," the district court was "shocked by the unconscionableness of the claim . . . that the government can under a statute which . . . grants general amnesty to persons who appear and testify in obedience to a subpoena, compel them to testify, and thereafter break faith with them by denying the protection of the statute to those who testify in exact accordance with its terms." 294 F. at 547. Starting with the misconception that the immunity provision was an act of amnesty and not a *quid pro quo* for the constitutional privilege, the district court readily glided into question-begging by finding that there was a breach of faith in contesting the claim of amnesty.[2]

Once the confusion is avoided between an act of amnesty and an act which gives immunity in order "to make evidence available and compulsory that otherwise could not be got" because it could be withheld upon a claim of constitutional privilege, it becomes clear that a witness is not "entrapped" by requiring him to claim his constitutional privilege before affording him a substitute. A witness is no more entrapped by the requirement that he must stand

---

[2] It is significant that the *Heike* case, in which this Court held there was "no reason for supposing that the [immunity] act offered a gratuity to crime," 227 U. S. at 142, was cited neither by the court below in this case, nor by Judge Hutcheson in the *Pardue* case, 294 F. 543, nor in any of the cases following the *Pardue* ruling, *United States* v. *Ward,* 295 F. 576, *United States* v. *Moore,* 15 F. 2d 593, and *United States* v. *Goldman,* 28 F. 2d 424.

upon his constitutional rights, if he desires their protection, when there is an immunity statute than he is where there is none at all. It is one thing to find that incriminating answers given by a witness were given because in the setting of the particular circumstances he would not have been allowed to withhold them. It is quite another to suggest that one who appears as a witness should, merely because his appearance is in obedience to a subpoena, thereby obtain immunity "on account of any transaction, matter or thing concerning which he may testify," even though the incrimination may relate to a transaction wholly foreign to the inquiry in which the testimony is given and even though the most alert and conscientious prosecutor would not have the slightest inkling that the testimony led to a trail of self-crimination. Such a construction makes of the immunity statute not what its history clearly reveals it to be, namely, a carefully devised instrument for the achievement of criminal justice, but a measure for the gratuitous relief of criminals. The statute reflects the judgment of Congress that "the public has a right to every man's evidence." It is not for us to relax the demands of society upon its citizens to appear in proceedings to enforce laws enacted for the public good.

Beginning with the Securities Act of 1933, 48 Stat. 87, Congress has enacted no less than seventeen regulatory measures which contain provisions for immunity from prosecution in exchange for self-incriminating testimony. Of these, fourteen, including *inter alia* the Securities Exchange Act of 1934, 48 Stat. 900, the National Labor Relations Act, 49 Stat. 456, the Communications Act of 1934, 48 Stat. 1097, the Public Utility Holding Company Act of 1935, 49 Stat. 832, the Federal Power Act, 49 Stat. 858, and the Civil Aeronautics Act of 1938, 52 Stat. 1022, confer immunity when a person testifies under compulsion "after having claimed his privilege against self-incrimi-

nation." Three of these statutes, however, the Motor Carrier Act of 1935, 49 Stat. 550, the Industrial Alcohol Act, 49 Stat. 875, and the Fair Labor Standards Act of 1938, 52 Stat. 1065, do not contain this additional clause— they merely follow the old form customarily used by Congress prior to the Securities Act of 1933. Of course, there is a difference in the language of these statutory provisions. But the process of construing a statute cannot end with noting literary differences. The task is one of finding meaning; and a difference in words is not necessarily a difference in the meaning they carry. The question is not whether these provisions are different, but whether there is significance in the difference. If the difference in language reflected a difference in the scope of the immunity given, or in the nature of the considerations that moved Congress to make a differentiation, there would surely be some indication, however faint, somewhere in the legislative history of these enactments that some legislator was aware that the difference in language had significance. But there is none.

If Congress saw fit gratuitously to confer immunity to citizens who appear as witnesses in proceedings to enforce the Motor Carrier Act of August 9, 1935, it is hard to understand why it should give such immunity only to those who, after asserting their privilege, were pressed to give evidence in proceedings to enforce the Federal Power Act of August 26, 1935, and in proceedings to enforce the Public Utility Holding Company Act which became law the same day, and again should have given the privilege gratuitously in the Industrial Alcohol Act, which became law the following day. The Railroad Unemployment Insurance Act, 52 Stat. 1107, and the Fair Labor Standards Act of 1938, 52 Stat. 1065, both became law the same day, June 25, 1938. Yet the immunity provision of the former contains the "after having claimed, etc." clause, and that of the latter does not. It is only

fair to Congress to assume that if there was a purpose to make a difference in the demands upon citizens when they appear as witnesses under one statute rather than the other, that purpose would have been stated somewhere in the course of the legislative history. But there is a total absence of any indication anywhere that any Congressman had any notion that the enforcement of the Motor Carrier Act of 1935, the Industrial Alcohol Act, or the Fair Labor Standards Act of 1938, called for a different treatment of witnesses in proceedings under these Acts than in enforcement proceedings under the other fourteen Acts. The explanation seems obvious. There are no expressions in the legislative materials to indicate that the legislative purpose varied in this respect between these Acts because there was no difference in purpose.

But the variations in the phraseology employed in the Acts are not to be explained away as just caprices of a single draftsman. The explanation is likely to be found in the manner in which Congress usually acts in adopting regulatory legislation. If a single draftsman had drafted each of these provisions in all seventeen statutes, there might be some reason for believing that the difference in language reflected a difference in meaning. But it is common knowledge that these measures are frequently drawn, at least in the first instance, by specialists (perhaps connected with interested government departments) in the various fields. Provisions in different measures dealing with the same procedural problem not unnaturally, therefore, lack uniformity of phrasing.

We do not have to look very far in order to see how Congress happened to use one form of immunity provision in some of these statutes and another form in others. Consider the evolution of the three statutes which followed the old, pre-1933 form. The Motor Carrier Act of 1935 was enacted as an amendment to the Interstate Commerce Act. What was more natural than that the

enforcement provisions of the old Act should be incorporated by reference in providing for the new powers of the Commission. §§ 201, 205e, 49 Stat. 543, 550. And the Industrial Alcohol Act of 1935, so far as its enforcement provisions were concerned, was patterned upon its predecessor, the National Prohibition Act of 1919, 41 Stat. 317, and the draftsman naturally took the immunity provision from that statute.

The Fair Labor Standards Act of 1938 has a more complicated but even more revealing history. Introduced first in the Senate on May 24, 1937, it carried the explicit provision that a person gains immunity "after having claimed his privilege against self-incrimination." It remained in this form throughout the course of the legislation in both the House and the Senate for nearly a year, when the whole conception of the bill was changed. Everything was struck out after the enacting clause, and the new measure was submitted to the House on April 21, 1938. As part of that new bill, the provision for the attendance of witnesses in the enforcement of the Act simply incorporated by reference the provision of the Federal Trade Commission Act—and obviously this was because the draftsmen of the new bill drew heavily upon the scheme of that Act. But there is an utter want of evidence to support the suggestion that after a year the proponents of this legislation, and the committees that grappled with its problems, changed their minds as to the extent of the immunity to be afforded to witnesses summoned in proceedings under the Act. Nor is there any evidence in the debates that when Congress finally passed the measure in its present form, it meant to give a greater immunity than that which was provided in the various bills that were before the Senate and the House for a year.

The course taken by the Securities Act of 1933 before it was finally enacted is revealing as to the significance of

its immunity provision, the first to depart from the old form. Up to the time that the bills which eventually became the Act emerged from conference, the immunity provision followed the old form. The new formula appears for the first time in the bill reported by the conference. But neither in the conference report nor elsewhere is there any suggestion that the introduction of this phrase imported any new legislative purpose or that it was anything more than a careful rephrasing of a conventional statutory provision. In the case of the Fair Labor Standards Act, as we have seen, the more meticulous phrase, "after having claimed his privilege against self-incrimination," was in all successive bills in both the House and the Senate but it disappeared at the final stage of the enactment of the measure. No one ever suggested, so far as the available materials show, that the change in the formula implied any change as to the intended scope of the immunity provision. Style, not substance, is obviously the explanation. In the case of one statute, Congress began with the new form and ended with the old one; in the case of the other, it began with the old one and ended with the new. Upon what rational basis can we attribute to Congress an intention to make the scope of the immunity provision of the one statute vitally different from that of the other?

To attribute caprice to Congress is not to respect its rational purpose when, as here, we find a uniform policy deeply rooted in history even though variously phrased but always directed to the same end of meeting the same constitutional requirement.

I am therefore of opinion that an appearance in response to a subpoena does not of itself confer immunity from prosecution for anything that a witness so responding may testify. There must be conscious surrender of the privilege of silence in the course of a testimonial inquiry. Of course no form of words is necessary to claim one's

privilege. Circumstances may establish such a claim. But there must be some manifestation of surrender of the privilege. The prosecutor's insistence upon disclosure which, but for immunity from prosecution, could be withheld is that for which alone the immunity is given. History and reason alike reject the notion that immunity from prosecution is to be squandered by giving it gratuitously for responding to the duty, owed by everyone, to appear when summoned as a witness.

Since the demurrers to the pleas should have been sustained, the case should be remanded to the district court for appropriate disposition in accordance with the views herein expressed.

MR. JUSTICE DOUGLAS joins in this dissent.