**UNITED STATES of America,**
**Plaintiff,**

v.

**James CRANLEY, Defendant.**

No. 02–CR–222.

United States District Court,
E.D. Wisconsin.

March 10, 2003.

1038

Joy Bertrand, U.S. Dept. of Justice, Milwaukee, WI, for Plaintiff.

Brian P. Mullins, Fed. Defender Services of Eastern Wisc., Milwaukee, WI, for Defendant.

*DECISION AND ORDER ON OBJECTIONS TO MAGISTRATE'S RECOMMENDATION*

ADELMAN, District Judge.

Defendant James Cranley is charged with two counts of making false statements in connection with his acquisition of firearms and two counts of possession of firearms with the serial numbers obliterated. Defendant filed a motion to suppress inculpatory statements he made to· an agent of the Bureau of Alcohol, Tobacco and Firearms ("ATF") after his probation officer directed him to appear at her office and meet for the purpose of answering the ATF agent's questions. He argues that his statements are inadmissible because they were compelled, and because he was not advised of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Magistrate Judge Aaron E. Goodstein held a hearing on the motion on December 18, 2002, and recommended that it be granted. Both parties have objected to portions of the recommendation, and I address those objections herein. My review of the recommendation is *de novo. See* 28 U.S.C. § 636(b)(1); *United States v. Raddatz,* 447 U.S. 667, 673–76, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980).

## I. BACKGROUND

### A. Facts

In January of 2002 several firearms with obliterated serial numbers were recovered in Chicago, and the ATF traced the weapons to defendant. ATF Special Agent Vernon Mask conducted a record check and learned that defendant was on probation in Wisconsin.[1] On January 15, 2002, Mask contacted defendant's probation offi-

---

1. Defendant was under supervision from November 2001 until July 2002. Two of the conditions of his probation were that he report as directed by the agent and that he answer questions truthfully. His probation could have been revoked for a violation of either condition.

cer, Jennifer Schinker, in order to arrange an interview with defendant. Mask had several home addresses for defendant but did not attempt to locate him at any of them.

Schinker contacted defendant and directed him to report to her office on January 22 but did not inform him of the purpose of the meeting.[2] Defendant reported as directed, but Mask was unable to make it, and Schinker rescheduled the meeting to January 25. Schinker continued to conceal from defendant the ATF's interest. Defendant reported as instructed on January 25, but Mask was again unable to attend. Schinker then told defendant that the ATF wanted to talk to him and apologized for not telling him sooner. Schinker rescheduled to January 31. This time Mask was able to attend, and he proceeded to interview defendant in a conference room at the probation office. The conference room contained three tables and about twelve chairs and was not locked. Schinker was present for most if not all of the interview, at which Mask asked defendant about possible firearm violations. Defendant was not advised of his *Miranda* rights. No written statement was taken, and defendant was allowed to leave at the conclusion of the hour long interview.

On March 15, 2002, an investigator from the City of Racine Police Department contacted Schinker and advised her that a warrant had been issued for defendant's arrest. Schinker suspected (incorrectly, as it turned out)[3] that the warrant was related to the ATF investigation and

therefore contacted Mask. Mask called Racine police and persuaded them to withdraw the warrant. He then contacted Schinker on April 4 and indicated that the Racine Police Department had "pulled" the warrant, and that he wanted to speak to defendant again. As Mask put it, he had done something for defendant and wanted to see if defendant could do something for him.

On April 9, Schinker contacted defendant and directed him to report to her office on April 12 at 11:00 a.m. for the purpose of being questioned by the ATF.[4] When defendant arrived, Schinker took him to meet with Mask in the same conference room that was used for the previous interview, then left. Schinker returned briefly during the interview to see if Mask or defendant needed anything but was not otherwise present. The room was not locked.

Schinker testified that she was uncomfortable leaving one of her probationers with someone she did not know but felt that she had to comply with a request from a federal agency. She testified that when she left, the "tone" in the room was "probably discomfort from Mr. Cranley," and that she "didn't get the feeling that it was going to be a good meeting for them. It was, it was tense." (12/18/02 Hrg. Tr. at 36.) She further testified that the condition of defendant's probation requiring him to be truthful applied not only to her questions but also those posed by the ATF agent. She testified that if defendant had lied to Mask she "would also be in a position to react to that." (Tr. at 37.)

---

**2.** Schinker had met with defendant in her office three times prior to this meeting. She testified that defendant had been compliant and that she had not had to threaten him with revocation in December and January.

**3.** The warrant was related to a separate matter that occurred before defendant was placed on probation.

**4.** Schinker testified that she met with defendant three times between the January 31 and April 12 meetings, and that she had not had any problems with him.

Mask told defendant that he felt defendant was "holding back," and that he wanted to see if there was anything else defendant remembered pertaining to the firearms that were recovered. Mask did not advise defendant of his *Miranda* rights. Defendant proceeded to make an inculpatory statement, which Mask reduced to writing and had defendant sign.[5] The interview lasted one and one-half to two hours. Defendant was not restrained during the interview, did not ask to leave or use the bathroom, and was allowed to go home at its conclusion.[6] Mask testified that during the interview he did not tell defendant that he intended to arrest him, that he probably did not have handcuffs with him, and that he would have allowed defendant to terminate the interview and leave had defendant asked. He did not recall whether he was armed.

At neither of his interviews with Mask did defendant assert his Fifth Amendment right to remain silent and not incriminate himself. Defendant testified that he believed he was required to report for the interviews and truthfully answer Mask's questions as part of the conditions of his probation, and that if he failed to do so he would be revoked. He stated that he believed he was obliged to speak to Mask because his probation officer arranged the interviews, and the rules of supervision required compliance with her directives. He testified that although Schinker did not expressly tell him that he had to answer Mask's questions honestly, prior to the interviews she made him aware of the rule requiring that he be truthful. As noted, Schinker indicated that she would have

taken action against defendant had he lied to Mask.

**B. Magistrate Judge's Recommendation and Parties' Objections**

The magistrate judge concluded that defendant was not in custody and therefore was not entitled to *Miranda* warnings at either interview. Relying on *Minnesota v. Murphy*, 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), he also found that defendant's Fifth Amendment privilege was not "self-executing" during either interview, but that defendant's January 31 statement was nevertheless involuntary because defendant was compelled by his probation officer to attend and answer questions under threat of revocation. The magistrate judge considered it significant that Schinker attended the January 31 meeting. Because Schinker was not present at the April 12 interview, the magistrate judge concluded that defendant's statements at that meeting could be considered voluntary but should nevertheless be suppressed as fruit of the poisonous tree. He therefore recommended that defendant's motion to suppress be granted.

The government objects to the magistrate judge's conclusion that defendant's January 31 statement was involuntary, and further argues that, even if it was, there was a break in the stream of events between the January 31 and April 12 interviews, and thus the second statement should not be suppressed as fruit of the poisonous tree. Defendant objects to the magistrate judge's conclusions that he was not in custody, that his privilege was not "self-executing," and that his second statement was voluntary.

---

**5.** The written statement concludes with the language: "This statement which was written by Special Agent Mask is the truth and was provided voluntarily by myself. I have been treated well by the police and was not handcuffed or under arrest at the time this statement was given." (12/18/02 Hrg. Ex. 2 at 2.)

Mask testified that defendant did not volunteer this information; he wrote it out and asked defendant to sign.

**6.** Although the conference room was not locked, defendant had to be "buzzed" out of the building in order to leave.

## II. DISCUSSION

### A. Applicable Fifth Amendment Principles

 The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.

> [T]his prohibition not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also "privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings."

*Murphy*, 465 U.S. at 426, 104 S.Ct. 1136 (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973)). A person protected by the privilege may refuse to answer unless provided with immunity against the use of the compelled statements; absent such protection, his answers are inadmissible in a later criminal prosecution. *Id.*

 However, the privilege is not ordinarily "self-executing." In other words, if the person wants the protection of the privilege he must assert it. *See id.* at 427, 104 S.Ct. 1136 (citing *United States v. Monia*, 317 U.S. 424, 427, 63 S.Ct. 409, 87 L.Ed. 376 (1943)). Thus, in the ordinary case, if a witness under compulsion to testify voluntarily makes disclosures instead of claiming the privilege, the government has not "compelled" him to incriminate himself under the Fifth Amendment.[7] *Id.* (citing *Garner v. United States*, 424 U.S. 648, 654, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976)).

 There are several exceptions to this general rule. The first pertains to confessions obtained from suspects during custodial interrogation. *Id.* at 429, 104 S.Ct. 1136. In *Miranda v. Arizona*, the Court recognized that custodial interrogation involves "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467, 86 S.Ct. 1602. Therefore, the *Miranda* Court forbade the introduction of confessions obtained pursuant to custodial interrogation unless the suspect was advised of his rights to remain silent and to the presence of counsel, and freely waived those rights. *Id.* at 471–75, 86 S.Ct. 1602. The Court has noted that this "exception does not apply outside the context of the inherently coercive custodial interrogation for which it was designed." *Roberts v. United States*, 445 U.S. 552, 560, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980).

 The second exception to the general rule applies where the assertion of the privilege is penalized so as to foreclose a free choice to remain silent. *Murphy*, 465 U.S. at 434, 104 S.Ct. 1136. In the so-called "penalty situation," the person is threatened with economic or other sanctions that induce him to forego the privilege. *Id.* at 434–45, 104 S.Ct. 1136. For example, in *Garrity v. New Jersey*, 385 U.S. 493, 498–99, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), the Court held that a police officer threatened with loss of his job if he remained silent was excused from his failure to assert the privilege and found not to have waived it when he answered questions. *See also United States v. Frierson*, 945 F.2d 650, 658 (3d Cir.1991) ("In these cases, the Court has held that loss of job,

---

**7.** The classic example is a witness subpoenaed to provide testimony before a grand jury.

loss of state contracts, loss of future contracting privileges with the state, loss of political office, loss of the right to run for political office in the future, and revocation of probation all are 'penalties' that cannot be imposed on the exercise of the privilege.").

Finally, the third exception to the general requirement of a timely assertion of the Fifth Amendment privilege, closely related to the penalty exception, has been developed in the context of the federal occupational and excise taxes on gamblers. In recognition of the pervasive criminal regulation of gambling activities and the fact that claiming the privilege in lieu of filing a return would tend to incriminate, the Court has held that the privilege may be exercised by failing to file.

*Murphy*, 465 U.S. at 439, 104 S.Ct. 1136 (citing *Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); *Grosso v. United States*, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968)).

## B. Application of Principles to the Present Case

■■■ In the present case, it is undisputed that defendant did not assert his Fifth Amendment privilege during either of the interviews. Therefore, his statements are admissible unless his failure to assert the privilege is excused under one of the exceptions discussed above, or the statements were otherwise involuntary.[8]

### 1. In Custody

■■■ Defendant argues that he was in custody during the interviews with Mask. A person is considered to be "in custody" when his movement is restrained to a degree comparable to a formal arrest. *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995); *United States v. Yusuff*, 96 F.3d 982, 987 (7th Cir.1996) (citing *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983)). The Seventh Circuit has held that

custody "implies a situation in which the suspect knows he is speaking with a government agent and does not feel free to end the conversation; the essential element of a custodial interrogation is coercion." *United States v. Martin*, 63 F.3d 1422, 1429 (7th Cir.1995). Furthermore, "the initial determination of custody depends on the objective circumstances of the interrogation, not on

---

**8.** The "voluntariness" of a confession is typically analyzed under the Due Process Clause. *See United States v. D.F.*, 115 F.3d 413, 420–21 (7th Cir.1997); *Henderson v. DeTella*, 97 F.3d 942, 947 (7th Cir.1996). The Due Process inquiry focuses on whether, under the totality of the circumstances, the defendant's statement was the product of rational intellect and not the result of official abuse, intimidation, or deception. *Watson v. DeTella*, 122 F.3d 450, 453 (7th Cir.1997). The privilege against compulsory self-incrimination, on the other hand, arises under the Self–Incrimination Clause of the Fifth Amendment. The initial focus of this inquiry is on whether the defendant invoked the privilege and, if not, whether his failure could be excused because the privilege was "self-executing." If the defendant invoked the privilege or his failure to do so was excused, the key issue is whether the ensuing statement was "compelled." This issue is not analyzed based on the "totality of the circumstances." Rather, the focus is on "the power or force of the sanction imposed on silence." Lawrence Herman, *The Unexplored Relationship Between the Privilege Against Compulsory Self–Incrimination and the Involuntary Confession Rule*, 53 Ohio St. L.J. 497, 503 (1992). While the distinction between the due process/voluntariness and Fifth Amendment/self-incrimination analyses may be slippery, and the concerns animating them overlap, different legal standards have been developed for each. *See generally id;* Charles E. Moylan, Jr. & John Sonsteng, *The Privilege Against Compelled Self–Incrimination*, 16 Wm. Mitchell L.Rev. 249 (1990). This case, like *Murphy*, is properly analyzed under the Fifth Amendment self-incrimination standard.

the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California,* 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). In other words, "the only relevant inquiry is how a reasonable man in the suspect's shoes would have understood his situation." *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). *United States v. James,* 113 F.3d 721, 726 (7th Cir.1997).

 The court should consider the totality of the circumstances, and relevant factors include the purpose, place and length of interrogation, *United States v. Gravens,* 129 F.3d 974, 977 (7th Cir.1997); whether the encounter occurred in a public place; whether the suspect consented to speak with the officers; whether the officers informed the individual that he was not under arrest and was free to leave; whether the individual was moved to another area; whether there was a threatening presence of several officers and a display of weapons or physical force; whether the officers deprived the individual of documents he needed to continue on his way; and whether the officers' tone of voice was such that their requests would likely be obeyed. *United States v. Wyatt,* 179 F.3d 532, 535 (7th Cir.1999).

In the present case, defendant was not under formal arrest at either interview; rather, he was questioned at his probation agent's office. In *Murphy,* the Court held that a probationer summoned by his agent and asked incriminating questions was not in custody because, although he was "subject to a number of restrictive conditions governing various aspects of his life," there had been "no formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." 465 U.S. at 430, 104 S.Ct. 1136 (internal quotation marks omitted). Therefore, the agent was not required to provide him with *Miranda*

warnings. *Id.* at 430–31, 104 S.Ct. 1136; *cf. United States v. Humphrey,* 34 F.3d 551, 554–55 (7th Cir.1994) (holding that, under *Murphy,* the defendant was not in custody when his parole officer advised him to meet with two FBI agents at their offices).

In *Murphy,* the defendant made four arguments as to why *Miranda* should nevertheless apply. First, he argued that his probation officer could compel him to appear and provide truthful answers to her questions. However, the Court compared the defendant's situation to a witness subpoenaed to appear before a grand jury and sworn to tell the truth. Stating that such a witness was not entitled to warnings, the Court declined to require them for probationers. *Murphy,* 465 U.S. at 431, 104 S.Ct. 1136.

Second, the defendant argued that the probation officer deliberately sought incriminating evidence about another crime. The Court stated that, even so, it would not give rise to a self-executing privilege; police officers often question suspects with the purpose of acquiring incriminating evidence, but unless the setting is custodial, warnings are not required. *Id.*

Third, the defendant argued that he was not expecting to be questioned about other criminal activity and thus had not consulted with a lawyer. The Court responded that the nature of probation was such that the defendant could expect such questions, and that witnesses called before grand juries are also in the dark as to the scope of the investigation. *Id.* at 432, 104 S.Ct. 1136.

Fourth, the defendant argued that no one observed the interrogation to protect against abuse or trickery. The Court, however, found this no different than other forms of non-custodial interrogation where warnings are not required. Probation officers are allied with law enforcement, and

so the defendant should expect that his answers will not remain confidential but rather will be provided to the police. *Id.* at 432, 104 S.Ct. 1136.

Finally, the Court noted that custodial interrogations differed from typical meetings with probation officers in several important respects. Custodial arrest conveys the message to the suspect that he must submit to the officers' will and confess, while a probation interview, "arranged by appointment at a mutually convenient time, would [not] give rise to a similar impression." *Id.* at 433, 104 S.Ct. 1136. Further, unlike custodial interrogation, a probationer meeting with his agent is not thrust into an unfamiliar and intimidating environment; his previous meetings with his agent will serve to familiarize him with the office. Finally, custodial interrogation is coercive in part because the interrogator can insinuate "that the interrogation will continue until a confession is obtained." *Id.* Conversely, a probationer is not physically restrained and can leave at any time. *Id.*

Defendant Cranley argues that he was in custody during both interviews because he was compelled by the terms of his supervision to meet with Mask and truthfully answer his questions, and because his probation could have been revoked had he refused. He argues that *Murphy* is distinguishable because in that case the defendant was interrogated only by his probation agent, not a law enforcement officer. He also notes that his interviews were not "arranged by appointment at a mutually convenient time," as in *Murphy*, 465 U.S. at 433, 104 S.Ct. 1136; rather, he was directed by Schinker to appear at times coordinated between Schinker and Mask. Therefore, he contends, a reasonable person in his position would not have felt free to leave. Because *Miranda* warnings were not provided, he contends that his statements must be suppressed.

Although the circumstances of the present case are distinguishable from those in *Murphy*, and the question is a close one, I cannot conclude that defendant was in custody during either of the interviews with Mask. First, each of the sessions took place in an unlocked conference room. Second, defendant was not handcuffed or restrained. Third, defendant was questioned by just one law enforcement officer who did not display force, make threats or assume an aggressive posture. Fourth, neither Mask nor Schinker did anything to prevent defendant from leaving, such as taking his car keys or other personal property. Fifth, Mask never told defendant that he was under arrest or would be arrested. Although the standard is an objective one, I also note that Mask testified that defendant was free to leave at any time. Finally, at the end of each interview, defendant was allowed to leave. Therefore, although defendant was compelled to go to Schinker's office for the interviews, on neither occasion was his freedom of movement restrained to a degree associated with formal arrest. Defendant's objection to the magistrate judge's recommendation on this issue will be overruled.

**2. Penalty Situation**

Defendant also contends that he was precluded from exercising his Fifth Amendment privilege by the threat of revocation. A similar argument was raised in *Murphy*. While rejecting the contention that a probation interview *always* constitutes a "penalty situation," the Court noted:

A State may require a probationer to appear and discuss matters that affect his probationary status; such a requirement, without more, does not give rise to a self-executing privilege. The result may be different if the questions put to the probationer, however relevant to his

probationary status, call for answers that would incriminate him in a pending or later criminal prosecution. There is thus a substantial basis in our cases for concluding that if the State, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution.

*Id.* at 435, 104 S.Ct. 1136. The Court rejected Murphy's claim because the general conditions of probation that he appear as directed and provide truthful information to his agent, standing alone, were insufficient to create compulsion, and because no state officer suggested that the defendant could have been revoked had he remained silent. *Id.* at 438, 104 S.Ct. 1136. The facts of the present case require a different result.

Schinker ordered defendant to report to her office for the purpose of being interviewed by Mask. These were not regularly scheduled meetings; nor were they relevant to his probationary status. Rather, the interviews were scheduled at Mask's behest with the purpose of gathering information for the criminal investigation into the firearms recovered in Chicago.[9]

Prior to the interviews, Schinker reminded defendant that he was obliged to provide truthful information. Schinker also testified that if defendant had not answered Mask's questions truthfully she would have taken action, and that *she* felt obligated to cooperate with the ATF and obtain defendant's presence.[10] Thus, the factors absent in *Murphy* were present here—an admonishment by the agent to provide truthful information in the criminal investigation, backed by a genuine threat of revocation.

 Under the circumstances, a reasonable person in defendant's position would have believed that it was a requirement of his probation that he truthfully answer Mask's questions, and that declining to do so would lead to revocation. Schinker stopped short of making an explicit threat of revocation, but the implication that defendant would be revoked if he did not cooperate was clear. Therefore, I conclude that defendant's failure to assert his Fifth Amendment privilege may be excused, and that his statements were compelled because the price of silence would have been the loss of his freedom.[11]

 I see no distinction between the first and second interviews on this point. Schinker directed defendant to appear at both, and the threat to defendant was the same. Although Schinker was present for most of the first session and only part of the second, her role in creating the threat of a penalty occurred *prior* to the interrogations—when she ordered defendant to speak with Mask and conveyed the impres-

9. *Cf. id.* at 435 n. 7, 104 S.Ct. 1136 ("The situation would be different if the questions put to a probationer were relevant to his probationary status and posed no realistic threat of incrimination in a separate criminal proceeding.").

10. It seems clear that Mask used defendant's probationary status to gain a tactical advantage in this investigation. Although he knew defendant's address, Mask made no effort to contact defendant at home. Instead, he enlisted Schinker in his investigation, creating a degree of compulsion he could not have achieved alone.

11. *Humphrey* is easily distinguishable. There, the defendant was not ordered to meet with law enforcement officials, but merely advised to do so by his parole officer; the interview took place at the FBI's offices, not at the parole officer's; and there was no threat of revocation, implicit or explicit, if the defendant did not meet with and speak truthfully to the FBI. 34 F.3d at 554–55.

sion that doing so was a condition of defendant's probation. Schinker's presence at the first interview may have added immediacy to the threat but was inessential to its operation. By the time defendant was ordered to appear for the second interview, Schinker had made clear what was expected of him. Thus, defendant's statements at both interviews were compelled in violation of the Fifth Amendment and must be suppressed.[12]

## III. CONCLUSION

THEREFORE, IT IS ORDERED THAT the magistrate judge's recommendation is ADOPTED in part, as stated herein, and that defendant's motion to suppress is GRANTED.

12. Probation agents in Wisconsin may compel those they supervise to appear and provide truthful information, even if the resulting statements are self-incriminatory, without violating the Fifth Amendment. But such statements are inadmissible in subsequent criminal proceedings. *State v. Evans*, 77 Wis.2d 225, 235, 252 N.W.2d 664 (1977) (creating a rule of use and derivative use immunity for statements compelled by probation officer, and requiring that the probationer be advised that his otherwise self-incriminating statements are inadmissible against him during subsequent proceedings on related criminal charges). Neither Schinker nor Mask offered defendant immunity from the use of his statements prior to compelling him to speak.