[Civ. No. 7848. Third Dist. Aug. 21, 1950.]

GEORGE H. McLAIN, Petitioner, v. THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent.

Kenny & Morris and John L. Brannely for Petitioner.

J. Francis O'Shea, District Attorney, and Elvin F. Sheehy, Chief Criminal Deputy District Attorney, for Respondent.

VAN DYKE, J.—On February 20, 1950, petitioner herein, George H. McLain, was indicted by the Grand Jury of Sacramento County. The indictment contained four counts, in each of which petitioner was charged with the crime of bribery in that he gave a bribe, consisting of the sum of $75, to John W. Evans, then a member of the state Legislature, with intent to influence the said legislator in giving or withholding his vote on bills introduced for passage. The alleged dates of bribe-giving were January 27th, February 25th, April 8th and April 15th, all in 1949. The accused has filed herein a petition for a writ of prohibition, asking that the Sacramento County Superior Court be restrained from taking any further steps or proceedings based upon the indictment, save to dismiss the same.

It is the fundamental contention of the petitioner that he cannot be prosecuted under the indictment because he was required to testify before the Senate Interim Committee on Social Welfare, touching upon the matters charged in the indictment, and thereby acquired immunity.

It appears without dispute in the record that the aforesaid committee was investigating matters having to do with social welfare pursuant to the Senate resolution creating the com-

mittee. In the course of its investigations the committee turned its attention to the activities of the Citizens Committee for Old Age Pensions, a nonprofit corporation. Its corporate purposes as expressed in its articles included the acquisition of real and personal property, and the fostering and promotion of public interest in a proposed initiative constitutional amendment concerning old age assistance. Its by-laws provided that the secretary should keep all books and records required by law and have custody of the corporate seal; and its treasurer should receive and receipt for all money and property, deposit all money in bank and pay out or otherwise dispose of the same as directed by the board of trustees. Desiring production of the books and records of the corporation, the committee, acting through a subcommittee, issued a subpoena to one Charles Ohlsen, who, in response thereto, appeared before the subcommittee on November 26, 1949. He testified that he was secretary and treasurer of the corporation, elected to those offices September 12, 1949, and that George McLain, Ray Howell and he were the members of the board of trustees of the organization. The subpoena had called upon him to produce for the years 1947 to 1949, inclusive, the financial records of the corporation. He testified that he had not brought the records and documents requested for the reason that he had never had them in his possession and that they were in the possession of Mr. McLain. However, he stated that he would demand possession of the records and make every effort to produce them, whereupon the committee recessed to give him opportunity to do so.

On December 3d he again appeared and testified he had not been able to get the records; that he had requested them of Mr. McLain and had been told he could not have them and if the committee wanted them it should summon McLain; further he testified that the records were not in the offices of the Citizens Committee.

Thereafter the committee issued a subpoena addressed to the corporation and to "George H. McLain, Chairman of said Citizens Committee for Old Age Pensions" commanding them to appear before the committee on a given date "as witness in an investigation by the said committee" and commanding them to bring with them all cancelled checks, check stubs, check ledgers and bank statements of all the accounts in the name of Citizens Committee for Old Age Pensions, including, but not limited to, the payroll account, the special account and the general (rental) account, for the calendar years

1948.. and 1949. Petitioner appeared and was sworn. He testified that he was chairman of the corporation and that he had received the subpoena. He was then told that he had been subpoenaed only in his capacity as chairman and in none other and was asked if he had the documents which the subpoena had required him to produce. He stated he had the records and would produce them as soon as he made a statement. Privilege to make such a statement was denied to him. Thereupon his counsel asked what particular documents they wanted the witness to hand over. Committee counsel asked first for all cancelled checks as demanded. Again petitioner stated his desire to make a statement which was again refused. Thereupon counsel for the committee suggested that if petitioner would waive immunity and allow full cross-examination he be allowed to make his statement. Petitioner replied in substance that he would not waive immunity but was ready to testify. Considerable discussion then followed between respective counsel concerning the conditions of the delivery of the records, the time that they might be kept for perusal by the committee, and the like. Counsel for the committee again asked petitioner if he had produced all the corporation's cancelled checks and the reply was that they were all there, with the exception of two bank statements and related cancelled checks, which he said had been stolen. After some time was spent in arranging the records, petitioner stated that for the convenience of the committee ''we have separated to the best of our ability the checks that have been issued to Assemblyman John Evans during 1948 and 1949 as one of our public relations counsel, so we will be very happy to turn these over to you during the time you are going through the checks.'' He thereupon handed the specified checks to counsel for the committee, who said, ''What are these?'' and petitioner replied, ''Checks made payable to John W. Evans.'' There were 22 checks which petitioner had identified, as above stated, and they were all copied into the records of the committee hearing. Four of them form the basis of the grand jury indictment of petitioner. They were signed ''Citizens' Committee for Old Age Pensions, George H. McLain,'' and bore the apparent endorsement of Mr. Evans, and also the usual stamps and punch marks indicating a clearance through the bank on which they were drawn.

By virtue of the foregoing, petitioner claims he has acquired immunity against prosecution under the provisions of section 9410 of the Government Code, formerly section 304 of the

Political Code, which, so far as here applicable, provides as follows:

"A person sworn and examined before the Senate or Assembly, or any committee, can not be held to answer criminally or be subject to any penalty or forfeiture for any fact or act touching which he is required to testify."

This section is found among a group of sections intended to govern the matter of summoning witnesses and producing documents before committees of the Legislature or one of the houses thereof. The statutes provide for the issuance of subpoenas, the service thereof, and punishment for contempt for neglecting or refusing to obey such process or to produce, upon reasonable notice, books, papers and documents in the possession or under the control of a person so subpoenaed.

The forerunner of the present legislation was enacted in 1857 (Stats. 1857, ch. 95), the declared purpose of the act being "To enforce more effectually the attendance of Witnesses on the Summons of either House of the Legislature of this State, and to compel them to discover Testimony." When the codes were enacted in 1872 this legislation was substantially carried into the Political Code and found expression in sections 300 to 304, inclusive, thereof. The legislation was continued without substantial change until 1943, when, during the general codification of much of the existing legislation not theretofore placed in the various codes, the subject matter was carried into the Government Code.

Legislation of this sort has been enacted by almost, if not all, of the state legislatures and many such statutes have been enacted by Congress. Generally speaking, they were intended to aid investigative agencies whose work might be and often was seriously impeded by witnesses claiming the constitutional privilege against self-incrimination found in the federal Constitution and in the constitution of almost all of the states, including California. (See Cal. Const., art I, § 13.) The principle involved had long received recognition and enforcement in England under the common law and in the early colonial governments. As stated in 8 Wigmore on Evidence, 3d edition, section 2250, page 276:

"The history of the privilege against self-crimination has something more than the ordinary interest of a rule of Evidence,—not only because the privilege has been given a constitutional sanction in nearly every one of our jurisdictions; nor merely because the tracing of its origin takes us so far afield, in our survey, as the administrative policy of William

the Conqueror, and the criminal procedure of Louis XIV and the French Revolution; but particularly because the woof of its long story is woven across a tangled warp composed in part of the inventions of the early canonists, of the momentous contest between the Courts of the common law and of the church, and of the political and religious issues of that convulsive period in English history, the days of the dictatorial Stuarts.''

Many decisions in the highest courts of this country, both state and federal, have been concerned with the construction and application of these so-called statutes of immunity. It will not be necessary to the decision of the issues presented here to refer to many of them.

It is the principal contention of respondent that immunity was not acquired by petitioner, not because the documents produced under the compulsion of the subpoena did not touch upon the alleged crimes for which he was later indicted, nor that the meager testimony he gave did not serve to identify and authenticate these documents, but that the production of the documents by petitioner and his testimony concerning them fell within permissible limits without the granting of immunity. Respondent contends that if anyone has documents, books and records of another in his custody and under his control which a legislative committee can properly cause to be produced a subpoena to produce may be properly served upon such person, compelling him to produce such records, and having so produced them, he may be further compelled to identify and authenticate them under oath and that if nothing more be done immunity has not been gained. On the contrary, petitioner contends that such limitations of the immunity provisions of our statute do not exist, have never been declared by our courts and that the plain language of the statute is to be given full and literal interpretation and scope. Petitioner contends that the statute represents an exercise of the legislative pardoning power and that to make it serve its purpose it must receive the broad construction claimed. They say, in effect, petitioner was subpoenaed to appear as a witness before the committee and to bring with him certain designated documents; he was sworn as a witness and required to testify; his testimony touched upon the alleged briberies for which he has been indicted and he is, therefore, by the plain language of the statute, immune to prosecution.

It has long been decided that the constitutional privilege inherent in the declaration that no party accused shall

be compelled in a criminal case to be a witness against himself was not available to corporations, which could be required to produce their books and papers by a subpoena *duces tecum*. Thus in *Wilson* v. *United States*, 221 U.S. 361 [31 S.Ct. 538, 55 L.Ed. 771], decided in 1911, the Supreme Court of the United States declared that a corporation could not resist upon such constitutional grounds the compulsory production of its books and papers. (See, also, *Heike* v. *United States*, 227 U.S. 131 [33 S.Ct. 226, 57 L.Ed. 450], and *Shapiro* v. *United States*, 335 U.S. 1 [68 S.Ct. 1375, 92 L.Ed. 1787].) And this right of a court or properly constituted investigative body to compel the production of such records has long existed, even though they may be temporarily in the custody of someone not authorized to have them by the corporation itself.

██ But there is a clear distinction between the admitted power of such a body as the Senate Interim Committee on Social Welfare to compel the production before it of such documents, and the right to compel testimony from the custodian of such documents which would incriminate the witness. The production of books and records is ordinarily procured by service upon appropriate persons of a subpoena *duces tecum*. Compulsion to testify is ordinarily brought about through subpoena *ad testificandum* or the swearing of a person who, although not subpoenaed, is actually in the presence of the tribunal and therefore can be made to respond to the general duty of all citizens to give testimony. There is no necessary connection between the two writs. Their functions are different and although they are in many cases combined in one form, as was the case here, nevertheless that is a mere matter of convenience and does not combine them in substance. This distinction between the two writs is noted and discussed in *Wilson* v. *United States, supra*. Discussing the nature and origin of the subpoena *duces tecum* the court declared that:

"While a subpoena duces tecum ordinarily contains the ad testificandum clause, this cannot be regarded as essential to its validity. The power to compel the production of documents is, of course, not limited to those cases where it is sought merely to supplement or aid the testimony of the person required to produce them. The production may be enforced independently of his testimony, and it was held long since that the writ of subpoena duces tecum was adequate for this purpose. As was said by Lord Ellenborough in *Amey* v. *Long*, 9 East, p. 484: 'The right to resort to means competent to compel the pro-

duction of written, as well as oral, testimony, seems essential to the very existence and constitution of a court of common law, which receives and acts upon both descriptions of evidence, and could not possibly proceed with due effect without them.' Where the subpoena duces tecum contains the usual ad testificandum clause, still it is not necessary for the party requiring the production to have the person producing the documents sworn as a witness. They may be proved by others.''

The court quoted from *Summers* v. *Moseley*, 2 Cromp. & M. 477, as follows:

'' . . . The party called upon in pursuance of such a process not as a witness, but simply to produce, would do so or not, and if he did not, I can entertain no doubt that it would have been open to the party for whom he was called to make an application to the court in the ensuing term to punish him for his contempt in not producing the document in obedience to such subpoena. Whether he could require to be sworn not ad testificandum, but true answer to make to such questions as the court should demand of him touching the possession or custody of the document, is not now the question. *Perhaps* he might; but we are clearly of opinion that he has no right to require that a party bringing him into court for the mere purpose of producing a document should have him sworn in such a way as to make him a witness in the cause, when it may often happen that he is a mere depository, and knows nothing of the documents of which he has the custody.' ''

The court continued:

''Treating the requirement to produce as separable from the requirement to testify generally what one knows in the cause, it follows that the latter may be omitted from the subpoena without invalidating the former. . . .

''Where the documents of a corporation are sought, the practice has been to subpoena the officer who has them in his custody. But there would seem to be no reason why the subpoena duces tecum should not be directed to the corporation itself. Corporate existence implies amenability to legal process.''

Here the subpoena was directed to the corporation and to petitioner as chairman of the board of trustees thereof and it required the production of the books and records referred to. However, when petitioner was sworn he became a witness pursuant to the *ad testificandum* part of the process served upon him. Indeed, there is no way in which a witness can be

sworn otherwise, although, as has appeared from the statement of facts, there was a prompt declaration by counsel for the committee that petitioner had been subpoenaed merely in his capacity as chairman of the board of trustees of the corporation and not otherwise. That position was departed from when to him there was administered the usual oath administered to all witnesses. The situation may be illustrated by inquiring how a sentence for contempt would have been served had the petitioner after the administration of the oath proved contumacious. Clearly, he would have served that sentence individually and not as chairman of the board of trustees. If, therefore, after the production of the books and papers in response to the subpoena *duces tecum,* by which production the demands of that process had been met, the petitioner, in response to appropriate questioning, gave testimony touching the facts and acts for which he now stands under indictment, no reason appears why he should not have the immunity granted him by the statute in exchange for his constitutional privilege against self-incrimination.

Before proceeding further it might well be said that although immunity was claimed at one point in the proceeding when the matter was suggested by counsel for the committee, nevertheless, under the holding of the Supreme Court in *United States* v. *Monia,* 317 U. S. 424 [63 S.Ct. 409, 87 L.Ed. 376], the claim of immunity or privilege was not necessary. The Supreme Court in the Monia case, interpreting a statute to all intents and purposes identical with our own upon this point, held that where the words of the statute granting immunity were plain and did not require claim for the immunity offered, it was not necessary that such claim be made. The court said the legislation involved in that case was plain and, "on its face, means to the layman that if he is subpoenaed, and sworn, and testifies, he is to have immunity." This declaration is clearly applicable to our own statute which is equally plain upon its face, which equally declares "A person sworn and examined before the Senate or Assembly, or any committee, can not be held to answer criminally or be subject to any penalty or forfeiture for any fact or act touching which he is required to testify."

Since the purpose of the so-called immunity statutes is to gain information by taking away the constitutional privilege of refusing to give testimony, exchanging therefor immunity, there is no reason why the immunity so voluntarily offered

by the Legislature should be whittled away by the courts. If the legislative fiat seems to be unduly generous, restriction should come from the Legislature. The statute before us here has been long on the books and many investigations have been conducted under it. If the Legislature was not satisfied with its working it has always had the remedy in its hands. Since it has not seen fit to make changes we must assume it wants the law as it is.

█ Applying, then, the plain language of the act to the facts here, did the petitioner, having been sworn, testify as to any fact or act touching the bribery with which he stands charged? We think he did. The term ''cancelled check'' is one of ordinary and general usage. Its meaning is well known. It means a check drawn, delivered, endorsed, presented, paid by the drawee bank and returned in due time to the drawer. It is to be presumed that the ordinary course of business has been followed and in respect to cancelled checks the orderly happening of the above actions is to be presumed. When permissible inferences and presumptions are considered, his testimony amounted to this: Here are four checks; they are cancelled checks of the Citizens Committee for Old Age Pensions; they were drawn and made payable to Assemblyman John W. Evans; they cleared through the committee's bank account; they are for $75 each; they are dated January 27th, February 25th, April 8th and April 15, 1949; my name appears as drawer for the Committee; I was then the Committee's Chairman of the Board of Trustees.

Having so testified, petitioner now stands indicted for having, on the several dates those checks bear, given bribes to Evans in the amounts for which the checks were drawn. Before the grand jury those checks were produced as being the very instruments of bribery, as being the things which constituted the bribes alleged to have been given. Without proving the facts to which petitioner testified the bribery charged would not be shown. It matters not that the same testimony could have been given by others. It was given by petitioner. Not only does it touch upon the bribery charged, but, if it be supplemented by proof of felonious intent thereby to influence the vote of Assemblyman Evans as charged, it will go far to establish the crime. When the legislative committee swore petitioner as a witness it contracted that he would be immune from prosecution for any crime touching which he might testify. When that testimony touched upon the alleged

bribery of Evans, immunity attached. Petitioner cannot be prosecuted therefor.

Let the peremptory writ be issued as prayed for directing respondent court to dismiss the indictment referred to herein and in the petition.

Adams, P. J., and Peek, J., concurred.

A petition for a rehearing was denied September 8, 1950, and respondent's petition for a hearing by the Supreme Court was denied October 19, 1950.