**In re FIVE STAR PARTNERS, L.P., Debtor.**

**FIVE STAR PARTNERS, L.P., Plaintiff,**

**v.**

**VINCENT NETHERLANDS PROPERTIES, B.V., Defendant.**

**Bankruptcy No. 93–72524.
Adv. No. 93–6784.**

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

July 8, 1994.

Dennis S. Meir of Kilpatrick & Cody, Atlanta, GA, for plaintiff/debtor.

Richard D. Ellenberg, Atlanta, GA, for defendant Vincent Netherlands Properties, B.V.

W. Brooks Stillwell, Savannah, GA, for amicus curiae Kragmore Properties, Inc.

### DECISION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

JAMES E. MASSEY, Bankruptcy Judge.

Vincent Netherlands Properties, B.V., a corporation organized under the laws of The Netherlands, (the "Defendant") holds by assignment a security deed on real property owned by Five Star Partners, L.P. (the "Plaintiff" or "Debtor") to secure a debt owed to the Defendant. When the Debtor filed this case, the Defendant had yet to comply with reporting and related requirements of the Georgia RICO Act. O.C.G.A. § 16–14–1, *et seq.* That statute provides in part that an alien corporation failing to comply with reporting and registration provisions "shall not be entitled to own, purchase, or sell any real property...." O.C.G.A. § 16–14–15(h). The Plaintiff contends that the Defendant's failure to comply with reporting and registration provisions of the Georgia RICO Act renders the Defendant's interest in the property voidable under 11 U.S.C. § 544(a).

There being no issue of material fact, each of the parties moved for summary judgment. In addition to the briefs submitted by the parties, Kragmore Properties, Ltd., a creditor, filed an amicus brief. The court heard oral argument from the Debtor, the Defendant and Kragmore on April 22, 1994.

The legal issues presented are matters of first impression. For the reasons given below, the court holds that O.C.G.A. § 16–14–15 is not a recording statute. The mere

failure of an alien corporation to comply with the reporting and registration provisions of the Georgia RICO Act does not permit a bona fide purchaser of real property to take title to that property free of the interests of the non-complying alien corporation in that property. The court further holds that the Debtor lacks standing under O.C.G.A. § 16–14–15 to challenge the validity of the security deed held by the Defendant.

### FINDINGS OF FACT

Five Star Investment Properties, Inc. ("FSIP") is the sole general partner of the Debtor. In December 1990, it acquired property consisting of three separate tracts of land located in Fulton County, Georgia, one of which is commonly known as the Biltmore Hotel (collectively the "Property"), from O.P.D.I.–U.S., Inc., a Georgia corporation, ("OPDI"). The purchase price consisted of $3,000,000 in cash and FSIP's Purchase Money Real Estate Note (the "Note") in the amount of $13,500,000. FSIP secured the Note with a Purchase Money Deed To Secure Debt (the "Security Deed"), which OPDI recorded in the office of the Clerk of the Superior Court of Fulton County, Georgia on December 18, 1990. The recorded Security Deed gave OPDI a first priority lien against the Property.

By deeds dated July 1, 1991, FSIP transferred the Property to itself and G. Lars Gullstedt ("Gullstedt"), who in turn transferred it to the Debtor. Those deeds were recorded on February 7, 1992.

By an assignment dated August 19, 1991, OPDI transferred its interest in the Note and Security Deed to Vincent Antilles Holdings, N.V., a Netherlands Antilles corporation ("VAH"). By an assignment also dated August 19, 1991, VAH transferred the Note and Security Deed to the Defendant. Each one of those assignments was filed of record on September 3, 1991.

Two years later, on September 3, 1993, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. A trustee has not been appointed and hence the Debtor is a debtor in possession. On September 28, 1993, about three weeks after the filing of the petition initiating this case, the Defendant complied for the first time with the reporting and registration provisions of the Georgia RICO Act.

### CONCLUSIONS OF LAW

A. *Summary Judgment Appropriate.*

Pursuant to Fed.R.Civ.P. 56(c) incorporated in Fed.R.Bankr.P. 7056, a party moving for summary judgment prevails if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). There is no disputed material fact in this case. There is only a question of the application of the law to the undisputed facts. This court has jurisdiction under 28 U.S.C. § 157(b)(2)(K). Accordingly, the motions for summary judgment are appropriately before the court.

B. *The Issues Presented.*

■ Section 544 of the Bankruptcy Code arms a bankruptcy trustee with the lien priority and rights of a hypothetical lien creditor or bona fide purchaser of real property of the debtor as of the moment the petition is filed.[1] The Plaintiff, as a debtor in possession with the powers of a trustee under 11

---

1. Section 544(a) provides in relevant part:
 (a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

 (3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser at the time of the commencement of the case, whether or not such a purchaser exists [and had perfected such transfer].

U.S.C. § 1107, seeks to use these "strong-arm" provisions to avoid the interest of the Defendant in the Property.

■ State law governs the validity and extent of liens and security interests in bankruptcy and hence determines the bounds of a trustee's rights under section 544(a). *Watkins v. Watkins,* 922 F.2d 1513 (10th Cir. 1991); *Lewis v. Diethorn,* 893 F.2d 648 (3rd Cir.1990), *cert. denied,* 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 332 (1990); *National Bank of Alaska, N.A. v. Erickson (In re Seaway Exp. Corp.),* 912 F.2d 1125 (9th Cir. 1990).

The Plaintiff challenges validity of the Defendant's lien under O.C.G.A. § 16–14–15(h). Section 16–14–15(h) provides:

> Each alien corporation that fails to file a report as required by subsection (c) of this Code section or fails to maintain a registered office and a registered agent as required by subsection (a) of this Code section shall not be entitled to own, purchase, or sell any real property and shall not be entitled to bring an action or defend in the courts of the state until such requirements have been complied with.

The Plaintiff argues that the Defendant's Security Deed is voidable because this statute means literally what it could be read to say: a non-complying alien corporation may not own real property in Georgia. The Plaintiff contends that the maintenance of a registered office and agent and the timely filing of reports pursuant to O.C.G.A. § 16–14–15(a) and (c) are additional recording requirements that are necessary to provide constructive notice of the interest of an alien corporation to bona fide purchasers of real property in Georgia.

The Defendant and Kragmore urge the court to limit the reach of O.C.G.A. § 16–14–15(h), which they contend should be no farther than necessary to serve what they say is the statute's purpose. They argue that the natural result flowing from the Debtor's interpretation and intended use of the statute is a forfeiture and that only the State of Georgia may seek to void an interest in property under the Georgia RICO Act.

Thus, the issues in this case are (1) whether O.C.G.A. § 16–14–15 is a recording statute permitting a bona fide purchaser of real property to take the property free of the interest of a non-complying alien corporation and (2) whether a bona fide purchaser of real property has standing under the statute to challenge the validity of a security deed held by a non-complying alien corporation.

C. *The Proper Rule of Statutory Interpretation.*

To decide this controversy, the court must analyze and determine the meaning of O.C.G.A. § 16–14–15(h). This task requires the application of proper principles of statutory interpretation.

The starting point of statutory analysis is always the statute itself. This is the approach taken by federal courts: "The meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, ... the sole function of the courts is to enforce it according to its terms." *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917). It is also the methodology used by Georgia courts: "[W]e look first to the words of the statute to determine what [the legislature's] intent was and if those words be plain and unambiguous and the intent may be clearly gathered therefrom, we need look no further in determining what the intent was." *Stone Mountain Memorial Ass'n v. Herrington,* 225 Ga. 746, 749, 171 S.E.2d 521, 523 (1969).

The Plaintiff argues that the plain meaning of subsection (h) mandates a judgment in its favor. It believes that because the provisions of the statute "unambiguously state that an alien corporation cannot own real property until it complies with the statute's requirements, an inquiry into the legislature's intent is unnecessary." (Debtor's Resp. To Mot. For Summ.J. and Mem. of Law In Supp. of Debtor's Cross–Mot. For Summ.J. at 8, n. 2). Thus, the Debtor would have the court read subsection (h) in isolation and apply its plain meaning. The Defendant and Kragmore find a different meaning of subsection (h) by considering matters outside its four corners.

The "plain meaning" rule is the genesis of the admonition that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, —— U.S. ——, ——, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992). There has been much debate recently about the proper role of the "plain meaning" rule in statutory interpretation. *See, e.g.,* Thomas G. Kelch, *An Apology For Plain–Meaning Interpretation of the Bankruptcy Code,* 2 Bankr.Dev.J. 289, n. 1 (1994). The debate is not new. In his diary entry on January 6, 1943, Justice Frankfurter wrote:

> My dissent in the Monia opinion, having been distributed the day before—turning on the proper construction of the immunity provisions under the Interstate Commerce and Sherman Laws and involving appropriate principles of statutory construction—I got the expected rise out of Stone for citing *Boston Sand Co. v. United States,* 278 U.S. 24 [41, 49 S.Ct. 52, 73 L.Ed. 170 (1928)] in which Holmes from my point of view dealt such a death blow to the so-called "plain meaning" construction, over the dissent of four, including Stone. The *Boston Sand* case is a bête noire to Stone and is the key to his habit of mechanical statutory construction except, of course, when there is a strong pull of policy in him the other way.[2]

Thus, the debate is more about the role of judges in deciding cases than the proper parsing of sentences. Even viewed as an exercise in linguistics, the rule is more difficult to apply than its name suggests. Justice Frankfurter presumably would not have been surprised that in *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the Supreme Court unanimously agreed that the federal RICO statute was unambiguous and then split 5–4 as to its "plain meaning."

■ If a statute's meaning is not plain, courts have attempted to ascertain legislative intent through various methods, including the following three-part analysis: (1) identify the ill or defect to be remedied, (2) look to the objective to be attained, and (3) construe the statute as a whole in its contextual setting. *Sutherland Stat. Const.* § 45.05 (5th ed. 1992). Of these tests, discovery of the objective is the most important.

> Of course it is true that the words used, even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing: be it a statute, a contract, or anything else. But it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning.

*Cabell v. Markham,* 148 F.2d 737, 739 (2nd Cir.1945) (L. Hand, J.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945).

D. *Application of the Plain Meaning Rule.*

■ When is meaning plain? Presumably, it is plain if there is no quarrel over the interpretation. Meaning is plain if the arguments for a contrary interpretation are specious or irrational. Meaning is plain if the words used leave no doubt about the law's command. Ambiguity, whether in a statute or other text, is present if the words used require a reader to guess what the author intended. Ambiguity is present if the passage as a whole or individual words evoke different understandings about what may be meant. Thus, the first inquiry is whether O.C.G.A. § 16–14–15(h), applied to the rights of a bona fide purchaser of real property, can reasonably be read in ways that would lead to conflicting outcomes in this case. If it cannot, then the court's task is complete, unless the "plain meaning" is contradicted by a reading of the subsection in the context of the statute as a whole. If the subsection

---

**2.** *From The Diaries of Felix Frankfurter,* Edited by Joseph P. Lash, p. 146 (1974). Mr. Justice Frankfurter wrote in his dissent in *Monia* "[T]he notion that because the words of a statute are plain, its meaning is also plain, is merely pernicious oversimplification. It is a wooden English doctrine of rather ancient vintage." *United States v. Monia,* 317 U.S. 424, 431, 63 S.Ct. 409, 412, 87 L.Ed. 376 (1943).

alone could logically be read in conflicting ways, the analysis must continue.

There is no dispute that the Defendant, an alien corporation, had failed to comply with the Georgia RICO Act on the date that the Debtor filed its Chapter 11 case. There is also no dispute that the Security Deed held by the Defendant is valid and enforceable against the Debtor, unless the failure to comply with the Georgia RICO statute renders that deed void or voidable by the Debtor. The critical words in the statute are that an alien corporation not in compliance with the statute "shall not be entitled to own, purchase, ... any real property...."

What does it mean to say that an entity "shall not be entitled to own [or] purchase" real property? Do those words mean that such a corporate purchase is ultra vires, even though it is normally the jurisdiction of incorporation whose laws prescribe the limits of the corporation's range of permitted activities? Do those words mean that in Georgia if an unregistered alien corporation buys real property, the sale is simply void, so that the seller remains the legal owner? Do those words mean that a non-complying alien corporation holds voidable title to real property? How would such a reading affect creditors of the alien corporation? If a company is "not entitled" to purchase but does so anyway and then sells the property in an arms-length transaction, is the purchaser a bona fide purchaser of real property? Who can void such a purchase or sale?

The key word in subsection (h) is the word "entitled." Georgia courts have recently had occasion to consider its definition. As luck would have it, they disagreed with each other about its meaning. O.C.G.A. § 16–10–2(a)(1), a criminal statute dealing with bribery of public officials, provides in part:

[a] person commits the offense of bribery when ... [h]e gives or offers to give to any person acting for or on behalf of the state or any political subdivision thereof ... any benefit, reward, or consideration to which he is not entitled with the purpose of influencing him in the performance of any act related to the functions of his office.

The trial court charged the jury that "the word 'entitled' does not have any specific or extraordinary or particular legal terminology or definition" and then that "the word 'entitled' means to give a deed or title to." *Agan v. State*, 191 Ga.App. 92; 96 380 S.E.2d 757 (1989), *aff'd in part, rev'd in part* and *remanded*, 259 Ga. 541, 384 S.E.2d 863 (1989). The Court of Appeals reversed the conviction in part because of its concern that the jury might have thought that public officials are not "entitled" to campaign contributions. It said:

Although we recognize that one of the definitions given to "entitle" is substantially the same as that charged by the trial court, see *Black's Law Dictionary,* that same source also defines "entitle" as "[t]o qualify for; to furnish with proper grounds for seeking or claiming." "Entitle" or "entitled" also has been defined as connoting "the granting of a privilege or right ...; to give the right to demand or receive; ... to furnish with grounds for claiming ...; to furnish with grounds for seeking," 30 CJS Entitle 720–721, and as " 'qualified.' " *Davis v. City Council,* 90 Ga. 817, 820, 17 S.E. 110 (1893)....

... [A] campaign contribution, whether made to a candidate in the heat of a campaign or to encourage or influence the official after he is elected, is something which a candidate or elected official is qualified or privileged to request or receive and thus is something to which he is "entitled" within the meaning of O.C.G.A. § 16–10–2.

*Agan,* 191 Ga.App. at 96–98, 380 S.E.2d 757.

The Supreme Court reversed the Court of Appeals, stating:

As noted above, the Court of Appeals found the trial court's definition of the term "entitled" misleading because it failed to inform the jury that a public official is entitled to receive campaign contributions. Although we reverse this holding, we note the trial court's charge on the meaning of "entitled," ... was somewhat inapt. However, because the more appropriate meaning of "entitled" is more restrictive than the definition given by the trial court, we view any error as helpful to the accused, and harmless.

*Agan,* 259 Ga. at 544, 384 S.E.2d 863. What that more restrictive definition is, the Supreme Court did not say directly. It did hold that although an office holder may in one sense be entitled to receive a campaign contribution, a contribution can still be a bribe. It may not be too far-fetched to say that the Court would define a campaign contribution as money to which a candidate is entitled unless he is not entitled to it. In other words, the Court recognized that the word "entitled" has more than one meaning.

The word "entitled" is used differently in the bribery statute than in the Georgia RICO statute, at least insofar as the predicate in the one is an object (benefit, reward or consideration) and in the other, an action (to own, purchase or sell). The restricted definition not fully articulated by the Supreme Court in *Agan* is the sense of having a legal right to something, a meaning itself having different shades. This is not the sense of the word that the Debtor would have this court adopt. Here, the Debtor seeks a definition of "entitled" that would convey, not the idea of holding title illegally, but rather the idea of holding no title at all or voidable title because of the lack of constructive notice.

■ This court need not reconcile the differences in the sentence structure of the two statutes or otherwise rely solely on the confusion among the Georgia courts about the meaning of "entitled" in the bribery statute in order to decide whether "entitled" has a plain meaning in the Georgia RICO Act. It is enough that the court reads the words "shall not be entitled to own" in two distinct and conflicting ways.

Those words could be an expression of being in an unlawful state of ownership so that if an unregistered alien corporation owns real property, it is breaking the law.[3] This is the sense of the word "entitled" that the Supreme Court adopted in *Agan.* One

consequence of being in an unlawful state might be a surrender of ownership rights upon a proper challenge, or, as in *Agan,* a consequence could be that the transferor may have acted unlawfully.

The words "shall not be entitled to own" could also be read to mean that a non-complying alien corporation is not able to hold title to real property, in spite of having recorded a properly executed warranty deed.[4] This is the sense the Debtor contends in its briefs that the court should adopt.

Hence, the words do not necessarily convey to the reader a steadfast understanding that ownership is not possible, as opposed to being merely illegal. Moreover, these possibilities do not exhaust the universe of plausible readings. The word "entitled" might refer to the voidable nature of an instrument purporting to convey title, a strained reading preferred by the Debtor at oral argument. It might also be read to refer to the legal capacity of the alien corporation, although that reading is also strained. Therefore, even assuming that it would be proper to read a subsection of a statute in isolation, it is plain that subsection (h) is not plain.

E. *Alternative Methods of Statutory Interpretation.*

■ When the meaning of words in a statute is ambiguous, a court must look to sources other than the words alone to discover the legislature's intent. As mentioned above, a court may examine the stated purpose of the legislation. The court may read the statute in light of the ill or defect to be remedied. And, the court may read a particular passage in the context of the legislation as a whole. There are, of course, additional rules and methods used by judges to answer specific inquiries about a statute's meaning.

---

3. The words "shall not be entitled" would mean the same in a statute that read: "Without having first obtained a license, a person shall not be entitled to drive an automobile." The failure to obtain a license would not prevent a person from driving, but it would make the act of driving illegal.

4. The words "shall not be entitled" would mean the same in a statute that read: "Without having first obtained the stamp of the secretary of state on a deed, a person shall not be entitled to record the deed or otherwise to obtain legal or equitable title to property described in the deed." The failure to have a deed stamped would not be illegal, but the party holding an unstamped deed would not enjoy the status of ownership.

**1.** *Purpose.* Determining the purpose of the Georgia RICO Act as a whole is easy. Subsection (b) of O.C.G.A. § 16–14–2, "Findings and Intent of General Assembly," is a straightforward expression of the legislature's intent. It states:

> (b) The General Assembly declares that the intent of this chapter is to impose sanctions against this subversion of the economy by organized criminal elements and to provide compensation to private persons injured thereby. It is not the intent of the General Assembly that isolated incidents of misdemeanor conduct be prosecuted under this chapter but only an interrelated pattern of criminal activity, the motive or effect of which is to derive pecuniary gain. This chapter shall be construed to further that intent.

The general objective of the statute is to sanction organized criminal activity and to provide compensation to private parties injured as a result of such activity.

In expressing its intent, the General Assembly referred to the "chapter" in which section 2 appears. It is an inescapable conclusion that a section which is a part of the chapter was placed there to further that intent. "The construction of language and words used in one part of the statute must be in light of the legislative intent as found in the statute as a whole." *Williams v. Bear's Den, Inc.,* 214 Ga. 240, 242, 104 S.E.2d 230 (1958). Therefore, O.C.G.A. § 16–14–15, including subsection (h), should be read in light of the purpose of the Georgia RICO Act as a whole.

**2.** *The Ill or Defect To Be Remedied.* A court should be circumspect in applying a remedy not plainly spelled out in a statute, particularly where the remedy has only a tangential relationship to the defect purportedly addressed in that statute. Otherwise, it might mechanically prescribe harsh medicine to a misdiagnosed or even non-existent illness. "In construing law, whether statutory or constitutional, proper regard should be given to the old law, the evil and the remedy." *Moore v. Baldwin County,* 209 Ga. 541, 545–546, 74 S.E.2d 449 (1953).

O.C.G.A. § 16–14–2(a) identifies the general ill or defect to be remedied as organized criminal activity:

> (a) The General Assembly finds that a severe problem is posed in this state by the increasing organization among certain criminal elements and the increasing extent to which criminal activities and funds acquired as a result of criminal activity are being directed to and against the legitimate economy of the state.

The Debtor's remedy to that ill is to read section 15 as requiring compliance with its reporting and registration provisions in order to provide constructive notice to bona fide purchasers. The Debtor admits that failure to report or register would work a harsh result on innocent alien companies that are merely negligent, but it contends that the legislature and the Georgia Supreme Court have been willing to tolerate seemingly severe results for noncompliance with statutes affecting real property interests. In that regard, the Debtor relies on *Higdon v. Gates,* 238 Ga. 105, 231 S.E.2d 345 (1976).

In *Higdon,* the grantee of a warranty deed had failed to pay the real estate transfer tax required by the predecessor to O.C.G.A. § 48–6–4(b) when recording his deed. That statute provided in relevant part: "No deed, instrument or other writing ... shall be filed for record ... until the tax imposed by this article has been paid...." The Supreme Court held that failure to comply with that statutory requirement meant that the deed could not serve as constructive notice to a bona fide purchaser for value without actual notice of the prior transfer. *Higdon,* 238 Ga. at 107, 231 S.E.2d 345. As a result, a subsequent security deed given by the former owner and recorded by his lender took priority over the prior recorded, but untaxed warranty deed.

The statute in *Higdon* prescribed medicine thought necessary to cure the ill of recording a deed without payment of the transfer tax. The dosage was so strong, however, that it cured the disease by killing the patient and possibly had the additional side effect of giving at least mild chest pains to every real estate lawyer in Georgia. Not surprisingly, the Georgia General Assembly abrogated the

result in *Higdon* in 1983 by amending O.C.G.A. § 48–6–4(b) to add: "provided, however, that any such deed, instrument, or other writing filed or recorded which would otherwise constitute constructive notice shall constitute such notice whether or not such tax was in fact paid."

The Debtor's reliance on *Higdon* is misplaced. *Higdon* is important, not because it illustrates the "effect of noncompliance with statutes regarding interests in real property" (Debtor's Resp. To Mot. For Summ.J. and Mem. Of Law In Supp. Of Debtor's Cross–Mot. For Summ.J. at 13), but because it serves as a backdrop to a comparison of O.C.G.A. § 48–6–4(b), as it existed prior to 1983, and O.C.G.A. § 16–14–15(h) with respect to their wording and to their treatments of the ills to be remedied. Aside from the obviously dissimilar subject matters, the statutes differ in at least two other material respects.

First, O.C.G.A. § 48–6–4(b) specifically referred to a bar to the recording of deeds. The Court in *Higdon* looked to the deed itself and found it defective, not because the transfer tax had not been paid (although that was a finding below), but because the deed on its face did not reflect the clerk's certificate that the transfer tax had been paid. By contrast, O.C.G.A. § 16–14–15(h) contains neither the word "deed" nor the word "record." A title examiner would search in vain for any mention of compliance with the RICO Act on the face of a deed. The omission of recording language casts doubt on an interpretation of O.C.G.A. § 16–14–15(h) as a recording statute.

██ Second, the ill to be remedied by O.C.G.A. § 48–6–4(b) was the tripwire that created the bar to filing a deed. As a part of the title on "Revenue and Taxation," that section addressed directly the ill of failure to pay a due and owing tax. By contrast, O.C.G.A. § 16–14–15(h) is only indirectly concerned with the ill addressed by the Georgia RICO Act. It is not the failure to file reports or to designate registered agents or offices that is the primary ill, the cure for which is a bar to real property ownership. The primary ill is organized criminal activity. Reporting and registration are not what the Georgia RICO Act is about in the way that collecting taxes is what O.C.G.A. § 48–6–4(b) is about.

The words "shall not be entitled to own" do not elicit the same understanding as the words "no deed, instrument or other writing . . . shall be filed for record." Indeed, the fact that the legislature did not use the same or similar words in O.C.G.A. § 16–14–15(h) that it used in O.C.G.A. § 48–6–4(b) suggests that it intended to avoid a *Higdon*-like result. The ill of organized criminal activity would not be addressed by the voiding of a deed of an innocent, negligent alien corporation, except for the remote possibility that an alien criminal enterprise might thereby be encouraged to file a report or register that it would not otherwise file. To ascribe to the legislature an intent to void the deeds of the innocent or to render them voidable by bona fide purchasers is to decide that the legislature believed that the benefits of chance filings by criminal enterprises that might then occur would somehow outweigh the obvious social costs imposed. This is the thinnest of reeds on which to support legislative intent.

3. *Context.* "[T]he words of a statute are always to be construed in connection with their context. . . ." *Bibb County v. Hancock,* 211 Ga. 429, 440, 86 S.E.2d 511 (1955). Absent the anchor of context, the written or spoken word will be ambiguous, if not meaningless. *King v. St. Vincent's Hospital,* 502 U.S. 215, ——, 112 S.Ct. 570, 574, 116 L.Ed.2d 578 (1991) ("the meaning of statutory language, plain or not, depends on context"). Only in context will words communicate the idea that the author intended to convey. *See, Leach v. Federal Deposit Ins. Corp.,* 860 F.2d 1266, 1270 (5th Cir.1988), *cert. denied,* 491 U.S. 905, 109 S.Ct. 3186, 105 L.Ed.2d 695 (1989). For example, without reference to the contextual setting in which a reader finds the word "garnish," the reader might just as easily assume that a sprig of parsley adorns a dinner plate, as expect the seizure of funds in the hands of a third party to satisfy a judgment.

The legislature passes statutes in a unit of sections. Consequently, a court should construe each section of a statute in light of

every other section to produce a harmonious whole. "No segment of a statute should be lifted out of context and construed without consideration of other parts of the statute." *Brown v. Momar, Inc.*, 201 Ga.App. 542, 411 S.E.2d 718 (1991). Thus, subsection (h) cannot be considered in isolation as the Debtor proposes.

 Context may imply purpose. The legislature could have placed the registration requirements for alien corporations in Title 14, O.C.G.A. on "Corporations, Partnerships and Associations" or the consequences of the failure to comply in Title 44, O.C.G.A. on "Property." The fact that O.C.G.A. § 16–14–15 appears in neither of these titles is significant. The logical inference to be drawn from the placement of section 15 and in particular of subsection (h) in Title 16, "Crimes and Offenses", and in the chapter codifying the Georgia RICO Act specifically, is that those provisions relate primarily to the expressed purpose of the Georgia RICO Act.

"It is the duty of the court to consider the results and consequences of any proposed construction and not so construe a statute as will result in unreasonable or absurd consequences not contemplated by the legislature." *New Amsterdam Cas. Co. v. Freeland,* 216 Ga. 491, 495, 117 S.E.2d 538 (1960). Reading subsection (h) out of its context could lead to results not at all consistent with the purpose of the Georgia RICO Act as a whole. For example, if the words "shall not be entitled to own" mean that a deed into an alien corporation is void, then the transferor would enjoy the windfall of the property in addition to consideration received from the alien corporation. That result would frustrate the purpose of the Georgia RICO Act to compensate the State or victims of criminal activity. If the criminals have fled the jurisdiction with their portable loot but real property ownership reverts to the former owner, the injured victim or the State would receive nothing.

A fair question is: what benefit is subsection (h) if it does not at least render voidable a property interest held by a non-complying alien corporation to satisfy the deliberately ignored demand of the State that such an entity report or to satisfy a sanction for organized criminal activity? The answer is:

it may render an ownership position voidable by the State or even by a crime victim (issues not before the court) but need not do so through an attack on the capability of a deed to provide constructive notice to bona fide purchasers.

 4. *The Meaning of O.C.G.A. § 16–14–15(h).* The placement of O.C.G.A. § 16–14–15(h) in the Georgia RICO Act, the stated purpose of that Act, the absence of language referring to the recording of deeds or the effect of non-compliance with the RICO Act on lien priority, and the absence of language suggesting that the voiding of deeds is the remedy intended to correct the defined ill defeat the Debtor's interpretation of that subsection. The court holds that O.C.G.A. § 16–14–15 is not a recording statute that would give a bona fide purchaser of real property superior title to that of a non-complying alien corporation. Subsection (h) means that an alien corporation owning, purchasing or selling real property does so illegally if it has failed to comply with O.C.G.A. § 16–14–15. As discussed below, there are other considerations which support this interpretation and provide equally compelling bases for summary judgment in the Defendant's favor.

### F. *The Rights of the State of Georgia Under the Georgia RICO Act.*

In *Department of Transp., State of Ga. v. Moseman Const. Co.,* 260 Ga. 369, 393 S.E.2d 258 (1990), cited by Kragmore, the Georgia Supreme Court interpreted a statute that might have been read to impose harsh penalties on those failing to comply with it. The Georgia Nonresident Contractors Act, O.C.G.A. § 48–13–30, requires foreign companies to register with the Revenue Commissioner, to pay a $10 fee, to appoint the Georgia Secretary of State as agent for service of process and to post a bond. In *Moseman,* a foreign construction corporation sued to recover additional compensation under a contract with the Georgia Department of Transportation (the "DOT"). The DOT moved to dismiss the claim and thereby avoid paying Moseman after it had completed its work simply because Moseman had failed to comply with the statute. The Supreme Court

held that "permanent forfeiture of ... the claim ... because of [a] failure to register and bond ... is a draconian penalty which the courts incline against." *Moseman,* 260 Ga. at 370, 393 S.E.2d 258.

*Moseman* is significant because it suggests that even if the State of Georgia sought to void or to cause a forfeiture of the Defendant's interest in the Property, it would not succeed. The Debtor does not allege that the Defendant might be engaged in organized criminal activity or deliberately defied the reporting provisions of the Georgia RICO Act. Yet, the protection of innocent parties was a concern to which the legislature expressly referred in admonishing the superior courts in civil cases under the Georgia RICO Act to make "due provisions for the rights of innocent persons." O.C.G.A. § 16–14–6(a). It would therefore defy logic to hold that subsection (h) permits a bona fide purchaser to achieve what the chief law enforcement officer of the State of Georgia could not in Georgia's own courts.

### G. *Violation of the Georgia Constitution.*

■ The Georgia Constitution provides: "No bill shall pass which refers to more than one subject matter or contains matter different from what is expressed in the title thereof." Art. 3, § 5, ¶ III. Georgia courts have stated that the purpose of this constitutional provision is to ensure against covert or surprise legislation. *Mead Corp. v. Collins,* 258 Ga. 239, 367 S.E.2d 790 (1988). While this provision does not require a synopsis of the law in the title or the expression of minute detail, *Devier v. State,* 247 Ga. 635, 277 S.E.2d 729 (1981); *Ladson v. State,* 248 Ga. 470, 285 S.E.2d 508 (1981), the title must reasonably express the general subject matter and all matters properly connected therewith. *Brown v. Clower,* 225 Ga. 165, 166 S.E.2d 363 (1969).

■ The heading of the Georgia RICO Act sets forth the following regarding O.C.G.A. § 16–14–15, "To amend Code Title 26, relating to crimes and offenses, as amended, ... to require alien corporations to file certain information; ...." Ga.L.1982, p. 1385–86. The Act's heading makes no mention of provisions permitting bona fide purchasers or anyone akin to them to take title free of the interests of a non-complying alien corporation not involved in organized criminal activity. If subsection (h) permitted a bona fide purchaser to acquire property free of such interests, it would violate Georgia's Constitution.

■ It is a fundamental tenet of statutory interpretation that a statute will be construed in such a way as to avoid unconstitutionality if at all possible. N. Singer, *Sutherland Stat. Const.* § 45.11 (5th ed. 1992); *Henry v. City of Macon,* 91 Ga. 268, 18 S.E. 143 (1893). Hence, the court holds that subsection (h) does not permit a bona fide purchaser to take title free of the interests of a non-complying alien corporation not involved in organized criminal activity because otherwise, subsection (h) would violate Georgia's Constitution.

### H. *No Right of Action Under O.C.G.A. § 16–14–15(h).*

■ The interpretation of subsection (h) advanced by the Debtor would give a right of action to persons not injured by a criminal conspiracy and would thus permit such persons to avoid transfers of real property to a non-complying alien corporation. Assuming that title to real property held by such a corporation can be deemed void or rendered voidable, the Debtor must show that it has standing to enforce the statute.

The Defendant challenges the Debtor's standing to bring this action on the ground that the Debtor's reading of the statute would effect a forfeiture, which the Defendant contends is available only to the State of Georgia. Because the Debtor rests its claim to a superior right to the Property on 11 U.S.C. § 544, the Defendant confuses the concept of avoidance with that of forfeiture.[5]

---

5. If every holder of an unperfected security interest could resist a bankruptcy trustee's exercise of power under section 544 on the basis that it was having to forfeit property, that section would have been known as the "frail arm" provision. That the Debtor is not proposing to effect a forfeiture does not solve its standing problem, however.

Whether the Debtor contends that a deed held by a non-complying alien corporation is simply a nullity or that such a deed is incapable of providing constructive notice to a purchaser, the source of the bona fide purchaser's argument for a superior right to property is the RICO Act. The question is whether a bona fide purchaser has standing to raise the issue of a deed made defective or null by that Act. If a purchaser not injured by activity prohibited by the statute lacks standing to assert superior title to real property, the Debtor would lack standing.

The interpretation of a similar statute by the Georgia Supreme Court not only answers the standing question, but also lends immense support to this court's reading of subsection (h). *American Mortg. Co. of Scotland v. Tennille*, 87 Ga. 28, 13 S.E. 158 (1891) involved a statute remarkably similar to subsection (h). The statute in *Tennille* appeared in the Foreign and Domestic Corporations Title of the Georgia Code that existed at the time. It provided in pertinent part:

> And no foreign corporation, or corporation incorporated by the laws of another State, shall own more than five thousand acres of land, except upon the conditions aforesaid, of becoming a corporation under the laws of Georgia.

Act of February 28, 1877, Ga.L.1877, p. 36. This statute would appear facially to be an even more direct and affirmative prohibition on land ownership than that of subsection (h).

In *Tennille*, a foreign corporation took an assignment of a note secured by real property. After it obtained a judgment against Tennille on the note, the foreign corporation reconveyed the real property that had secured the note to Tennille for the purpose of the execution of a levy on that land. Tennille filed an affidavit of illegality in which he asserted that the Act of February 28, 1877 prohibited the plaintiff from conveying the property to him or from holding title to the land. The trial court dismissed the case after the plaintiff failed to produce its charter and deeds to property that would have presumably showed it owned over 5,000 acres of land in Georgia.

The Supreme Court, in an opinion written by Justice Lumpkin, reversed. The *Tennille* court stated the defendant's challenge of the plaintiff's right to own more than 5,000 acres of land was no different than an individual's challenge of the actions of a corporation as *ultra vires*, which could be raised only in a direct action instituted by the State. Justice Lumpkin concluded that, like a dispute over *ultra vires* activities, a challenge under the Georgia law restricting alien land ownership could only be raised at the instance of the State, and "that individuals have no right to make the question in controversies with each other." *Tennille*, 87 Ga. at 30, 13 S.E. 158. The court reasoned that the prohibition on ownership was enacted to protect the State and not individual citizens.

The class of protected persons may be broader under the Georgia RICO Act than the 1877 statute, since, in addition to the State, persons injured by organized criminal activity are within its parameters. Nonetheless, the Debtor, like Mr. Tennille, is not within the class of persons that the statute is intended to protect. Because this court declines to disregard the teaching of *Tennille*, the Debtor lacks standing to bring this case.

*CONCLUSION*

■ The Debtor, standing in the shoes of a hypothetical bona fide purchaser of the Property, may not avoid the assignment of the Security Deed to the Defendant under section 544(a)(3) of the Bankruptcy Code based upon the Defendant's pre-petition failure to comply with O.C.G.A. § 16–14–15. O.C.G.A. § 16–14–15 does not impose additional recording requirements on alien corporations necessary to give constructive notice to bona fide purchasers of real property in Georgia. That section is intended to provide the State with information necessary to monitor and regulate alien corporations' real property investments and thereby to aid in the achievement of the objective of the Georgia RICO Act. O.C.G.A. § 16–14–15(h) does not bar a non-complying alien corporation from acquiring legal title to real estate; it merely provides that a failure to comply with the statute renders the purchase, sale or ownership of real property illegal. Assuming

that O.C.G.A. § 16–14–15(h) provides a basis for voiding a deed held by a non-complying alien corporation, the Debtor has no standing under the Georgia RICO Act to challenge the Defendant's ownership interest in the Property.

It is, therefore,

ORDERED AND ADJUDGED that the Defendant's motion for summary judgment is GRANTED. The Debtor's cross-motion for summary judgment is DENIED.