*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2016 UT 29**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

In the matter of the Adoption of
BABY Q.

PHILLIP J. JAMES,
*Appellant,*

*v.*

D.Q. and S.Q.,
*Appellees.*

No. 20150143
Filed July 1, 2016

On Certification from the Court of Appeals

Second District, Farmington
The Honorable Robert J. Dale
No. 142700107

Attorneys:

Asa E. Kelley, Park City, for appellant

Troy L. Booher, Derek J. Williams, Julie J. Nelson,
Salt Lake City, for appellees

JUSTICE PEARCE authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE DURHAM, and JUSTICE HIMONAS joined.

JUSTICE PEARCE, opinion of the Court:

¶ 1 Phillip J. James, according to a voluntary acknowledgment of paternity, is the biological father of Baby Q. (Child), a girl who has now been adopted by D.Q. and S.Q. (Adoptive Parents). James sought to intervene in the adoption proceeding, but the district court denied his motion. The district court found that James had failed to take the actions needed to preserve his ability to contest the adoption

within thirty days of receiving a prebirth notice informing him that Child's mother (Mother) intended to place Child for adoption. James appealed from the district court's order denying his intervention. On April 7, 2016, we entered an order reversing the district court's order and remanding this matter for further proceedings. We now issue this opinion explaining the rationale underlying our April 7 order.

## BACKGROUND

¶ 2 James and Mother engaged in a relationship that resulted in a pregnancy with an anticipated September 2014 due date. As early as March 2014, Mother contacted LDS Family Services (LDSFS) to explore an adoptive placement for Child. In June, Mother participated in a phone conference with prospective adoptive parents, their attorney, and the local LDSFS director. During the telephone conference, the attendees discussed sending James a prebirth notice of Mother's intent to place Child for adoption, pursuant to Utah Code section 78B-6-110.1 (the Prebirth Notice Statute or the Statute). According to Mother, the prospective adoptive parents were not comfortable placing their names on the notice, so "[i]t was decided that it was to be issued with [Mother's] name on it." On July 11, 2014, a process server personally delivered the prebirth notice, titled "Notice of Adoption" (the Notice), to James at his home.

¶ 3 The Notice informed James that Mother intended to place Child for adoption and instructed him that if he wished to contest the adoption he needed to "take steps to assume responsibility for the child and to establish rights . . . within 30 days of the date you received this notice." The Notice identified the required steps as: (1) initiating a paternity proceeding in district court; (2) filing an affidavit outlining James's ability to care for Child and his plans for doing so; and (3) filing a notice of commencement of paternity proceedings with the Utah Department of Health.

¶ 4 The Notice advised James that he "may lose all rights relating to [Child]," including the right to withhold his consent to Child's adoption, if he did not take the steps within thirty days. The Notice also advised James that he could consent to the adoption within thirty days if he wished, that communications between James and Mother (or anyone else) could not change James's rights and responsibilities "as indicated in this notice," and that Mother was not obligated to proceed with an adoption. Finally, the Notice indicated that it was "provided to you by" Mother and listed Mother's name, address, and telephone number. Neither Mother nor anyone else

signed the Notice. The Notice did not reference the Prebirth Notice Statute nor any other provision of the Utah Code.

¶ 5 James immediately contacted Mother, who denied sending the Notice. He also took the Notice to the Utah Department of Vital Records, where an "adoption specialist" advised him that the Notice was not a legal document because it was not signed, not notarized, and not filed with a court.[1] The adoption specialist also informed James that he had until twenty-four hours after Child was born to preserve his parental rights.

¶ 6 On August 22, forty-two days after he received the Notice, James filed a paternity action and affidavit with the district court. He also telephoned the prospective adoptive parents to inform them that he intended to contest the adoption. The prospective adoptive parents decided that they would not proceed with the adoption.

¶ 7 At this point, according to James, he and Mother had "meaningful discussions" about one or both of them raising Child. Yet unbeknownst to James, Mother continued to search for prospective parents to adopt Child. On August 28, Mother spoke with Adoptive Parents for the first time. She did not tell James because she did not want him to interfere. On September 4, again unbeknownst to James, Adoptive Parents petitioned to adopt Child.

¶ 8 Mother gave birth to Child by induced delivery on September 5, four days earlier than her originally scheduled inducement date. That same day, unaware that Child had been born, James filed a notice of paternity proceedings with the Department of Health. Mother returned home with Child, and on September 7, James arrived at Mother's home to discover Child had been born. Mother allowed James to spend time with Child. On September 11, James and Mother executed and filed a voluntary declaration of paternity naming James as Child's father. On September 12, Mother, without notifying James, relinquished her parental rights and surrendered Child to Adoptive Parents.

¶ 9 James learned of the relinquishment on September 14. About a week later, he filed a motion to intervene in Child's adoption proceeding. The district court denied James's intervention motion, reasoning that James had received notice under the Prebirth Notice

---

[1] This appeal does not ask us to address the advice James alleges he received from the Department of Vital Records.

Statute but had failed to take the required steps to pursue his rights within the Statute's thirty-day time period. The district court concluded that James had therefore lost any right to contest Child's adoption. James appealed. We reversed the district court's order and remanded for further proceedings. We now explain the basis of our decision.

## ISSUES AND STANDARD OF REVIEW

¶ 10   We resolve this appeal based on James's arguments that the Notice he received did not meet the requirements of the Prebirth Notice Statute.[2] These arguments require us to interpret the Statute, and they therefore present questions of law, which we review for correctness. *See 2 Ton Plumbing, L.L.C. v. Thorgaard*, 2015 UT 29, ¶ 17, 345 P.3d 675.

## ANALYSIS

¶ 11   The Utah Adoption Act (the Adoption Act or the Act) governs Utah adoptions. *See* UTAH CODE §§ 78B-6-101 to -146. The Act balances the interests of unmarried biological fathers, mothers, children, adoptive parents, and other parties. *See id.* § 78B-6-102(3) ("The Legislature finds that the rights and interests of all parties affected by an adoption proceeding must be considered and balanced in determining what constitutional protections and processes are necessary and appropriate."). Generally, the Act provides that an unmarried biological father who fails to take certain enumerated steps to substantiate his parental rights loses the ability to contest the adoption of his child upon the mother's relinquishment of the child for adoption. *See id.* § 78B-6-121(3). However, a mother's relinquishment—and the resulting deadline for the unmarried father's actions—cannot occur until after the child is born. *Id.* § 78B-6-125(1) ("A birth mother may not consent to the

---

[2] James's appeal also raises multiple constitutional challenges to the Prebirth Notice Statute. Because we resolve this appeal on statutory interpretation grounds, we do not reach James's constitutional arguments. *See World Peace Movement of Am. v. Newspaper Agency Corp.*, 879 P.2d 253, 257 (Utah 1994) ("Although the parties urge myriad constitutional claims and defenses upon us, '[i]t is a fundamental rule that this Court should avoid addressing constitutional issues unless required to do so.'" (alteration in original) (citation omitted)).

adoption of her child or relinquish control or custody of her child until at least 24 hours after the birth of her child.").

¶ 12 In 2012, the Utah Legislature amended the Act to include the Prebirth Notice Statute. *See* Amendments to Adoption Code, ch. 340, § 4, 2012 Utah Laws 1633, 1636–37. The Prebirth Notice Statute allows an expectant mother, a child placement agency, or an attorney representing either the mother or a prospective adoptive parent to provide formal notice to an unmarried biological father that the mother is considering an adoptive placement for the child. *See* UTAH CODE § 78B-6-110.1(2). Upon receipt of statutory notice, the father must take certain steps to substantiate his parental rights within thirty days or lose the ability to contest an adoption. *Id.* § 78B-6-110.1(4)–(5). The Prebirth Notice Statute is intended to increase the certainty of the unborn child's future by requiring the father to take prompt steps to substantiate his parental relationship and by precluding the father from subsequently interfering with an adoption proceeding if he fails to comply with the Statute.

¶ 13 It is undisputed that James did not take the steps the Prebirth Notice Statute requires within thirty days of receiving the Notice. Indeed, the record reflects that although James appears to have eventually complied with the statutory requirements, he did not do so until after thirty days had elapsed. James did not file a paternity action and affidavit until forty-two days after he received the Notice, and he did not file notice with the Department of Health for another two weeks after that. James would therefore have lost the ability to contest Child's adoption if the Notice triggered the Prebirth Notice Statute's thirty-day compliance period. *See id.*

¶ 14 James argues that the Notice did not trigger the Prebirth Notice Statute's thirty-day period, because the Notice did not comply with the requirements the Statute imposes. Specifically, James argues that the Notice did not come from Mother or any of the other persons the Prebirth Notice Statute authorizes to provide notice. James also argues that the Notice did not comply with the Statute because it informed him that he "may," rather than "shall," lose his parental rights if he did not take the required steps within thirty days.

## I. MOTHER, A STATUTORILY AUTHORIZED PARTY, ISSUED THE NOTICE

¶ 15 James argues that the Notice was invalid because it had not been sent by an individual authorized to give such notice under the Prebirth Notice Statute. The district court ruled that Mother had

issued the Notice because the Notice recited that it came from Mother and Mother had participated in the conference call where it was decided that the Notice would be provided in her name. James nevertheless argues that the Notice did not come from Mother or any other individual authorized under the Statute. We disagree.

¶ 16    The Prebirth Notice Statute provides,

> Before the birth of a child, the following individuals may notify a birth father of the child that the mother of the child is considering an adoptive placement for the child: (a) the child's mother; (b) a licensed child placing agency; (c) an attorney representing a prospective adoptive parent of the child; or (d) an attorney representing the mother of the child.

UTAH CODE § 78B-6-110.1(2). Any of the four named individuals can provide effective notice if the notice identifies the person giving notice and includes that person's address and phone number. *Id.* § 78B-6-110.1(4).

¶ 17    Here, the Notice stated, "This notice has been provided to you by [Mother] . . . ." The Notice also listed Mother's address and phone number. This is all the Statute requires to identify the provenance of a notice. *See* UTAH CODE § 78B-6-110.1(4).

¶ 18    James testified by affidavit that the lack of additional information caused him to question the Notice's validity: "I was unclear of what to do or how to address the Pre-Birth Notice because the name on the top of the Notice was the private investigator that served me. When I contacted [Mother], she told me she did not know because she had not issued the Notice." Mother also provided an affidavit stating,

> 8. In June 2014, I had a conference call with [the prospective adoptive parents, their counsel, and LDSFS]. I was told that a Pre-Birth Notice could be issued to [James]. The [prospective adoptive parents] stated that they did not feel comfortable putting their names on it. It was decided that it was to be issued with my name on it.
>
> 9. I received a copy of the Pre-Birth Notice on July 29, 2014.
>
> 10. I did not sign the Pre-Birth Notice.

11. I did not prepare or issue the Pre-Birth Notice. I was told the Notice was to go out with my name on it. I did not know the contents of the Pre-Birth Notice.

12. I did not find the private investigator who served the Pre-Birth Notice, nor did I pay for his services.

Relying on Mother's affidavit, James argues that Mother "did not send [the Notice], authorize it or sign it," and that Mother "denies issuing it, seeing it or acknowledging what it is when asked about it."

¶ 19   The district court read Mother's affidavit differently. The district court found that Mother had agreed to give the Notice and that the decision to issue the Notice in Mother's name was made with her "input and involvement." For these reasons, and in light of the plain language of the Notice identifying Mother as its source, the district court concluded that the Notice came from Mother.

¶ 20   We agree with the district court. Although Mother's affidavit appears to have been carefully worded to downplay her role, it does not disguise the fair inference that she consented to the Notice being sent in her name. Mother conceded that she participated in the telephone conversation wherein "[i]t was decided" that the Notice would be provided in her name. She also conceded that she was told the Notice would issue with her name on it. Mother never testified that she objected to the Notice issuing under her name. Nor did she testify that she had any qualms about the plan developed at the meeting. It was reasonable for the district court to infer that Mother had agreed to the Notice being issued in her name and on her behalf.

¶ 21   Mother's involvement satisfies the Prebirth Notice Statute's requirement that one of four enumerated parties "notify" the birth father of the birth mother's intention to adopt. *See* UTAH CODE § 78B-6-110.1(2). As long as a notice originates with one of the parties authorized by the Statute and contains the required contact information for that person, we see no statutory requirement that the notice-provider be the person who drafts the notice, approves its precise wording, or serves it on the birth father. *See id.* § 78B-6-110.1(2), (4).

¶ 22   James also suggests that the Prebirth Notice Statute contains—or at least should contain—a requirement that the notice-provider sign the notice. Although the Prebirth Notice Statute's plain language contains no such requirement, James points out that rule 11 of the Utah Rules of Civil Procedure requires pleadings, motions,

and "other paper[s]" to be signed by either an attorney of record or by an unrepresented party. *See* UTAH R. CIV. P. 11(a). Without a signature, James argues, the Notice he received "does not even meet the standards of foundation to be entered as a legal document or evidence for any trial purpose." James does not appear to be suggesting that prebirth notices must qualify as court documents or be admissible as evidence to be effective; rather, his concern seems to be that unmarried biological fathers receive some assurance from the face of a notice that it in fact has come from the person named as the source of the notice.[3]

¶ 23   This is a legitimate concern. And the Legislature could have placed more formal requirements, including a signature requirement, into the Prebirth Notice Statute. Indeed, it may have even been advisable to add that requirement. However, the Legislature did not do so, and we are not at liberty to insert a substantive term into a statute. This is true even when we are convinced that sound policy would support its inclusion. *See Chris & Dick's Lumber & Hardware v. Tax Comm'n*, 791 P.2d 511, 515 n.2 (Utah 1990) ("It is not for us to add the legislation that Congress pretermitted." (quoting *United States v. Monia*, 317 U.S. 424, 430 (1943))).

¶ 24   For these reasons, we hold that the Notice was not rendered invalid by Mother's failure to personally prepare and arrange service of the document that was issued in her name. It is enough that the Prebirth Notice Statute authorized Mother to provide the Notice, which she agreed to the Notice going out under her name, and that the Notice included her contact information as the Statute required.

---

[3] James also suggests that a signature requirement is necessary so that notice recipients can identify and "seek a remedy" from the sender. However, upon receipt of a notice under the Prebirth Notice Statute, an unmarried biological father's "remedy" derives from the Statute and not from any interaction with or action against the notice-provider.

## II. THE NOTICE DID NOT INCLUDE REQUIRED INFORMATION CONCERNING THE CONSEQUENCES OF THE BIRTH FATHER'S NONCOMPLIANCE

¶ 25   James also argues that the Notice was invalid because it stated that he might—as opposed to would—lose certain rights relating to Child, including any right to withhold consent to Child's adoption, if he did not comply with the Prebirth Notice Statute's requirements within the thirty-day period. We agree with James. We also agree that James's receipt of the defective Notice did not trigger the running of the Statute's thirty-day clock.

¶ 26   The Prebirth Notice Statute specifies what information a valid notice must contain. It mandates that a notice "shall include . . . the consequences for failure to comply with [the Statute's requirements], including that: (i) the birth father's ability to assert the right, if any, to consent or refuse to consent to the adoption is irrevocably lost." UTAH CODE § 78B-6-110.1(4)(d).

¶ 27   The Notice did not inform James that his right to withhold consent to Child's adoption "is irrevocably lost" if he fails to comply with the Prebirth Notice Statute. Nor did it tell him that by failing to comply, he "will lose the ability to assert the right to contest any future adoption" and that he "will lose" the right to notice of the adoption. Rather, the Notice listed the steps that the Statute requires of birth fathers and then stated, "If you do not take these steps within 30 days of receiving this notice you *may* lose all rights relating to [Child]. This includes the right to consent or to withhold your consent to the adoption . . . ." (Emphasis added.)

¶ 28   The district court concluded that the Notice "contained all of the proper content and information required by the statute to be in such notice." This conclusion is incorrect. By informing James only that he "may" lose his rights, the Notice did not include information that the Prebirth Notice Statute requires—that James *would* lose his rights. *See* UTAH CODE § 78B-6-110.1(4)(d).

¶ 29   The Statute can strip a birth father of his rights only if the father is a "recipient of the notice described in Subsection (2)" of that statute. *Id.* § 78B-6-110.1(5). The Statute provides that "[t]he notice described in Subsection (2) *shall include*" certain information, including the consequences for failing to comply with the Statute within thirty days. *Id.* § 78B-6-110.1(4) (emphasis added). Without the required information, a notice is not a "notice described in Subsection (2)" and does not start the thirty-day clock for a birth

father to secure his rights under the Statute. *See id.* § 78B-6-110.1(4), (5).

¶ 30   Adoptive Parents argue that the Notice complies with the Prebirth Notice Statute because the Statute "requires only that the issuer inform the birth father of the risks of failing to perfect his rights, but does not require any particular words to describe those potential consequences." Adoptive Parents misread the Statute. The Statute does not contemplate "risks" or "potential consequences"; instead, it limns definite, actual consequences, including important rights being "irrevocably lost." UTAH CODE § 78B-6-110.1(4)(d)(i).

¶ 31   We agree with Adoptive Parents that the Prebirth Notice Statute does not mandate any particular verbiage. However, the statutory requirements cannot be satisfied by substituting the speculative "you may lose" for definite language such as "you will lose." The Prebirth Notice Statute is intended to provide certainty by requiring a birth father to make a knowing choice to either pursue his parental rights, or waive those rights and thereby facilitate the mother's announced intention to place the child for adoption. By suggesting that the consequences of non-compliance with the Statute were only possible instead of certain, the Notice failed to convey the gravity of the situation to James in the stark terms that the Legislature has mandated.

¶ 32   Adoptive Parents also argue that the Notice was factually more accurate than the notice the Prebirth Notice Statute envisions because there was a possibility that Mother might have elected not to place Child for adoption. Even if we were to agree with Adoptive Parents that more speculative wording could be characterized as "more accurate" than that the Statute requires, the Notice would still not satisfy the Statute's express requirements. In enacting the Statute, the Legislature created a mechanism to shorten the generally applicable timeframe for a birth father to pursue his rights. *Compare id.* § 78B-6-110.1(5) (requiring action by the biological father within thirty days of receiving prebirth notice), *with id.* § 78B-6-121(3) (requiring action by the biological father prior to the time the mother executes her consent for adoption or relinquishes the child for adoption). We presume that when enacting that mechanism, the Legislature balanced the competing interests of birth fathers, birth mothers, adoptive parents, and adopted children.

¶ 33   In striking this balance, the Legislature concluded that a prebirth notice must contain certain information to give birth fathers the ability to know and protect their interests. For example, a birth

father must have the ability to determine from the face of a notice whether it starts the statute's thirty-day clock running or not. *See id.* § 78B-6-110.1(4). In exchange, the father is prohibited from relying on any representations that the mother or third parties might make about the notice. *Id.* § 78B-6-106(1) ("Each parent of a child conceived or born outside of marriage is responsible for his or her own actions and is not excused from strict compliance with the provisions of this chapter based upon any action, statement, or omission of the other parent or third parties."). Similarly, the Statute requires that a birth father be informed of the rights that he will lose if he fails to act timely. *Id.* § 78B-6-110.1(4). The Legislature—perhaps in recognition that words like "will lose" might light a fire that words like "may lose" might not—requires a prebirth notice to inform a father that he *will* lose the statutorily enumerated rights if he fails to comply with the Statute.

¶ 34 Here, the Notice did not contain information that the Prebirth Notice Statute expressly requires. The Notice therefore did not start the thirty-day clock for James to pursue his rights.

## CONCLUSION

¶ 35 The district court correctly concluded that the Notice came from Mother for purposes of the Prebirth Notice Statute. However, the district court erred in concluding that the Notice contained all of the information the Statute requires. Because the Notice did not contain all of the information the Statute mandates, the thirty-day clock did not begin to tick and James's failure to comply within that time frame did not deprive him of his ability to contest Child's adoption. For these reasons, we reversed the district court's order denying James's intervention motion and remanded to the district court.

———————————